**WOMEN'S MEDICAL PROFESSIONAL CORPORATION, et al., Plaintiffs,**

v.

**Bob TAFT, et al., Defendants.**

**No. C–3–00–368.**

United States District Court, S.D. Ohio, Western Division.

Sept. 20, 2001.

---

Dave Carr Greer, Bieser, Greer & Landis, Dayton, OH, Jennifer Lynn Branch, Alphonse & Gerhardstein, Cincinnati, OH,

Janet Crepps, New York City, for Plaintiffs.

Stuart Harris, Ohio Atty. Gen. Corrections Litigation, Columbus, OH, Mary Crawford, Anne Berry Strait, Ohio Atty. Gen. Health & Human Services Section, Columbus, OH, Elizabeth Schuster, Ohio Atty. Gen. Chief Counsel's Staff Section, Columbus, OH, Karl Schedler, Assist. Atty. Gen., Columbus, OH, for Bob Taft, Betty D. Montgomery, defendants.

Gregory Paul Dunsky, Montgomery County Prosecutor's Office, Dayton, OH, for Mathias H. Heck, Jr., defendant.

DECISION AND ENTRY PERMANENTLY ENJOINING DEFENDANTS FROM ENFORCING PROVISIONS OF SUBSTITUTE HOUSE BILL 351 WHICH PROHIBIT PRE–VIABILITY AND POST–VIABILITY PERFORMANCE OF PARTIAL BIRTH PROCEDURE; PLAINTIFFS' CHALLENGE TO CONSTITUTIONALITY OF CIVIL LIABILITY PROVISION OF SUBSTITUTE HOUSE BILL 351 DISMISSED FOR LACK OF STANDING; JUDGMENT TO BE ENTERED IN FAVOR OF PLAINTIFFS AND AGAINST DEFENDANTS; TERMINATION ENTRY

RICE, Chief Judge.

This case presents a facial challenge to the constitutionality of Substitute House Bill 351 ("HB 351" or "the Act"), which was to have become effective in August, 2000. The Plaintiffs are the Women's Medical Professional Corporation ("WMPC") and Dr. Martin Haskell. The Defendants are Ohio Governor Bob Taft, Ohio Attorney General Betty Montgomery and Montgomery County (Ohio) Prosecutor Mathias H. Heck, Jr.

The Plaintiffs commenced the present litigation on July 27, 2000, seeking declaratory relief regarding the constitutionality of HB 351 and seeking to enjoin the Defendants from enforcing the Act, which, with certain exceptions, bans Ohio physicians from performing, or attempting to perform, an abortion procedure identified as the "partial birth procedure." The Plaintiffs contend that HB 351 is unconstitutional for a number of reasons. These arguments may be divided into four categories. *First,* the Plaintiffs contend that the Act imposes an unconstitutional "undue burden" on certain women seeking abortion services in Ohio. *Second,* they argue that the Act lacks an adequate exception allowing the "partial birth procedure" to be performed when it is necessary to preserve a woman's health. *Third,* they contend that the Act is unconstitutionally vague and lacks adequate scienter standards. *Fourth,* they assert that the Act unconstitutionally permits third-party civil suits against physicians who violate its terms. The Court granted a ten-day Temporary Restraining Order ("TRO") on August 17, 2000, prohibiting enforcement of the Act. (Doc. # 4). On September 1, 2000, the Court extended the TRO until Tuesday, September 19, 2000. (Doc. # 16).

With respect to the Plaintiffs' request for preliminary injunctive relief, the Court held an oral and evidentiary hearing on September 5–6, 2000. During that proceeding, the Court heard testimony from two medical practitioners, Plaintiff Haskell and Ray Paschall, M.D., who testified as an expert witness for the Defendants. The Court also heard testimony from Barbara Brewer, a clinical psychologist who testified as an expert for the Plaintiffs. In addition, the Court admitted into evidence, by stipulation of the parties, testimony from several other individuals who did not attend the September 5–6, 2000, oral and evidentiary hearing. Those individuals include Rein Siiner, M.D., Paula Hillard, M.D., Mary Campbell, M.D., George Goler, M.D., Haynes Robinson, M.D., Raymond Gasser, M.D., Nancy Romer, M.D., Anthony Levatino, M.D., John Doe # 1, M.D., John Doe # 2, M.D., Jane Doe # 1, who was a patient of Plaintiff Haskell, and John Paulson, who is employed by the Ohio Department of Health. The parties provided the Court with affidavits, declarations and/or deposition testimony from some of the foregoing individuals. Others testified before the Court in a 1995 case, *Women's Medical Professional Corp. v. Voinovich,* 911 F.Supp. 1051 (S.D.Ohio 1995) (Rice, J.), which involved the same parties but somewhat different issues. The parties stipulated to the Court's consideration of extensive excerpts from the testimony and exhibits presented in the 1995 case.

After considering the foregoing evidentiary materials, the Court entered a Preliminary Injunction on September 22, 2000, enjoining the Defendants from enforcing HB 351, pending a final decision on the merits.[1] *See Women's Medical Profes-*

---

1. Based on the evidence presented at the preliminary injunction hearing, the Court made four findings with respect to the issues raised by the Plaintiffs in this litigation. *First,* the Court held that the Plaintiffs *did not* demonstrate a substantial likelihood that, in the pre-viability context, HB 351 imposes an undue burden on a pregnant woman's right to have an abortion by banning the dilation and evacuation or "D & E" method of pregnancy termination. *Second,* the Court held that the Plaintiffs *did* demonstrate a substantial likelihood that, in both the pre-viability and post-viability context, HB 351 is unconstitutional because it lacks adequate exceptions allowing the "partial birth procedure" to be performed when necessary to preserve the health of the woman. *Third,* the Court held that the Plaintiffs *did not* demonstrate a substantial likelihood that HB 351 is unconstitutionally vague

*sional Corp. v. Taft,* 114 F.Supp.2d 664 (S.D.Ohio 2000) (Rice, J.). Thereafter, on January 9–11, 2001, the Court conducted a full oral and evidentiary hearing on the merits of the Plaintiffs' request for permanent injunctive and declaratory relief. (*See* Minutes, Doc. # 44; Hearing Transcripts, Doc. # 45–47). A number of witnesses testified at the January, 2001, hearing, including Dr. Siiner, Rebecca Jackson, M.D., Morton P. Hibbert, M.D., Plaintiff Haskell, Cassing Hammond, M.D., LeRoy Sprang, M.D., Charles A.C. Ballard, M.D., and clinical psychologist Barbara Brewer. In conjunction with the January, 2001, hearing, the parties also provided the Court with a joint stipulation of exhibits, which includes, *inter alia,* numerous expert reports, medical journal articles, and a transcript of the deposition of Phillip Ney, M.D. (*See* Stipulation, Doc. # 48). Following the January, 2001, oral and evidentiary hearing, the parties submitted post-hearing Memoranda and proposed findings of fact and conclusions of law. (Doc. # 49–51, 54–55). The Court then heard final arguments on April 3, 2001. (*See* Minutes, Doc. # 56).

Having reviewed all of the testimony and exhibits submitted in connection with both the September, 2000, and January, 2001, hearings, the Court now concludes, for the reasons to follow, that HB 351 is unconstitutional on its face, insofar as it bans the pre-viability and post-viability performance, or attempted performance, of the "partial birth procedure." In particular, the Court finds that, in both the pre-viability and post-viability context, the Act lacks adequate exceptions allowing the "partial birth procedure" to be performed when it is necessary to preserve a woman's health. Accordingly, based on the reasoning and citation of authority set forth, *infra,* the Court will enter a declaratory judgment and will permanently enjoin the Defendants from enforcing HB 351's ban on the "partial birth procedure." Insofar as the Act provides certain third parties with a cause of action for monetary damages against physicians who perform the "partial birth procedure," however, the Court concludes, for the reasons to follow, that the Plaintiffs lack standing to challenge that portion of the Act. In particular, with respect to the civil liability provision, the Plaintiffs have not demonstrated the existence of a justiciable "case or controversy" with the Defendants in this litigation. Consequently, the Plaintiffs are not entitled to declaratory or injunctive relief with respect to the civil liability component of HB 351.

## I. *Analysis*

Plaintiff WMPC is an Ohio corporation that currently provides, and intends to continue providing, medical services in Montgomery, Hamilton and Summit Counties, Ohio.[2] WMPC's services include the

---

or that it lacks adequate scienter requirements. *Fourth,* in the preliminary injunction context, the Court declined to address the constitutionality of the Act's civil liability provision, expressing serious doubt about its ability to issue injunctive relief capable of redressing the Plaintiffs' alleged injury. *See Women's Medical Professional Corp.,* 114 F.Supp.2d at 705, 706 n. 55.

**2.** Throughout this Opinion, the Court will incorporate the factual findings on which it relies to support its issuance of a permanent injunctive and declaratory relief. The Court adopts those findings as its "Findings of Fact" for purposes of Fed.R.Civ.P. 52(a). *See Women's Medical Professional Corp.,* 911 F.Supp. at 1094 n. 44 (recognizing that Rule 52(a) is satisfied if the record adequately indicates the factual basis for a court's legal conclusions); *see also Grover Hill Grain Co. v. Baughman–Oster, Inc.,* 728 F.2d 784, 792–93 (6th Cir.1984) ("This Court has enunciated a liberal standard for reviewing the adequacy of a District Court's findings. Findings should be comprehensive and relevant to the issues

"partial birth procedure" identified in HB 351. The corporation, which fears criminal and civil liability for its actions after the effective date of this Act, sues on its own behalf and on behalf of physicians, counselors and staff members who are employed at its various affiliated locations, as well as on behalf of women who receive medical services, including abortions, at these locations. Plaintiff Haskell, a physician, is the owner of WMPC. Haskell provides abortion services to women who reside throughout Ohio and other states. His patients include women seeking abortion services through approximately the 24th week of pregnancy. Haskell utilizes the "partial birth procedure" banned by HB 351.[3] He intends to continue providing abortion services in a manner contrary to the Act after its effective date, thereby exposing himself to criminal prosecution and to civil liability.

Before turning to the merits of this litigation, the Court pauses briefly to address three threshold issues that it previously resolved in its preliminary injunction ruling. *First*, the Court notes that it has federal question jurisdiction under 28 U.S.C. § 1331, because this action involves a federal constitutional challenge to a state statute. *See Women's Medical Professional Corp.*, 114 F.Supp.2d at 667. *Second*, the Court concludes, for the reasons set forth in its prior ruling, that Plaintiff Haskell has standing to pursue the present action on behalf of himself and his patients. *Id.* at 667–68. *Third*, the Court finds, again for the reasons set forth in its prior ruling, that Plaintiff Haskell has standing to challenge HB 351's pre-viability and post-viability ban on the performance of the "partial birth procedure."[4] *Id.* at 668.

Having made the foregoing findings, the Court turns now to the merits of this litigation. In so doing, the Court will presume a degree of familiarity with its preliminary injunction ruling in this case. Therein, the Court provided a lengthy review of the substantive law governing the regulation of abortion, with particular emphasis placed on three cases: (1) this Court's ruling more than five years ago in *Women's Medical Professional Corp. v.*

---

so as to provide a rational basis for the trial court's decision.... The findings should be explicit so as to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the grounds on which the trial court reached its decision.").

**3.** In its preliminary injunction ruling, the Court noted that the banned "partial birth procedure" is similar to abortion procedures known as the "D & X" or the "intact D & E." In its prior ruling, the Court also used the term "D & X" as a shorthand reference for the banned "partial birth procedure." *See Women's Medical Professional Corp.*, 114 F.Supp.2d at 688–91; *see also Stenberg v. Carhart*, 530 U.S. 914, 928, 931, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (recognizing that the terms "D & X" and "intact D & E" are interchangeable, and interpreting a ban on "partial birth abortion" as an attempt to prohibit those procedures).

**4.** In finding that Plaintiff Haskell had standing to challenge the Act's post-viability ban on the "partial birth procedure," the Court previously noted that he performs abortions through the 24th week of pregnancy, a stage of development at which a fetus has a realistic possibility of maintaining life outside of the womb. *Women's Medical Professional Corp.*, 114 F.Supp.2d at 668. The Court's conclusion on this issue is consistent with the additional evidence presented at the January, 2001, full oral and evidentiary hearing on the merits. In fact, the record reflects that Plaintiff Haskell likely has aborted fetuses up to 24 weeks and five or six days of gestational age. (Haskell testimony, Doc. # 46 at 309, 316–18). As a result, the Court adheres to its prior determination that he has standing to challenge the constitutionality of the post-viability provisions of HB 351.

*Voinovich,* 911 F.Supp. 1051 (S.D.Ohio 1995) (Rice, J.); (2) the Sixth Circuit's affirmance of that ruling in *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187 (6th Cir.1997); and (3) the Supreme Court's recent opinion in *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), which struck down a Nebraska statute banning "partial birth abortion." *See Women's Medical Professional Corp.,* 114 F.Supp.2d at 669–78 (reviewing the substantive law governing attempts to regulate the performance of abortions). For purposes of addressing the Plaintiffs' arguments, the Court will focus primarily upon the Supreme Court's ruling in *Carhart,* which sets forth the legal principles that are dispositive of key issues in this litigation.

As noted, *supra,* the Plaintiffs' arguments may be divided into four categories. *First,* they contend that HB 351 imposes an unconstitutional "undue burden" on certain women seeking abortion services in Ohio. *Second,* they argue that the Act lacks an adequate exception allowing the "partial birth procedure" to be performed when it is necessary to preserve a woman's health. *Third,* they contend that the Act is unconstitutionally vague and lacks adequate scienter standards. *Fourth,* they assert that the Act unconstitutionally permits third-party civil suits against physicians who violate its terms. As a means of analysis, the Court first will review the substantive provisions of HB 351. The Court then will address the foregoing issues in an order that best facilitates its review.

### A. *Substantive Provisions of HB 351*

HB 351 generally prohibits physicians from performing abortions by using what the Act identifies as the "partial birth procedure." This prohibition applies to the performance of both pre-viability and post-viability abortions.[5] *See* Ohio Rev.Code § 2919.151(B) (prohibiting use of the "partial birth procedure" when the fetus is viable); Ohio Rev.Code § 2919.151(C) (prohibiting use of the "partial birth procedure" when the fetus is not viable). Specifically, the Act provides that

> ... no person shall knowingly perform a partial birth procedure on a pregnant woman when the procedure is not necessary in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function.

Ohio Rev.Code § 2919.151(B) (post-viability) and (C) (pre-viability).

HB 351 defines the banned "partial birth procedure" as a four-step "medical procedure that includes all of the following elements in sequence:"

> (a) intentional dilation of the cervix of a pregnant woman, usually over a sequence of days;

> (b) in a breach presentation, intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother;

> (c) intentional partial evacuation of the intracranial contents of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, intentional compression of the

---

5. The term "viable," as used in HB 351, "means the stage of development of a human fetus at which there is a realistic possibility of maintaining and nourishing of a life outside the womb with or without temporary artificial life-sustaining support." Ohio Rev.Code § 2919.151(A)(6); Ohio Rev.Code § 2901.01(B)(1)(c)(ii).

head of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, or performance of another intentional act that the person performing the procedure knows will cause the death of the fetus;

(d) completion of the vaginal delivery of the fetus.

Ohio Rev.Code § 2919.151(A)(3).

The Act defines "from the body of the mother" to mean "that the portion of the fetus' body in question is beyond the mother's vaginal introitus in a vaginal delivery." Ohio Rev.Code § 2919.151(A)(2). The Act expressly excludes from its reach the "suction curettage procedure of abortion," the "suction aspiration procedure of abortion," and the "dilation and evacuation procedure of abortion." Ohio Rev.Code § 2919.151(F). The Act also provides that the "dilation and evacuation procedure of abortion does not include the dilation and extraction procedure of abortion."[6] Ohio Rev.Code § 2919.151(A)(1). The phrases "suction curettage procedure of abortion," "suction aspiration procedure of abortion," "dilation and evacuation procedure of abortion" and "dilation and extraction procedure of abortion" are not defined in the Act.

As noted, *supra*, HB 351 also includes an exception for the life and health of the mother. That exception permits the "partial birth procedure" to be performed when it is

... necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irre-

versible impairment of a major bodily function.

Ohio Rev.Code § 2919.151(B) (post-viability) and (C) (pre-viability). The Act defines the phrase "serious risk of the substantial and irreversible impairment of a major bodily function" to mean "any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(A)(5).

Finally, the ban on the "partial birth procedure" does not apply to a person "who performs or attempts to perform a legal abortion if the act that causes the death of the fetus is performed prior to the fetus being partially born even though the death of the fetus occurs after it is partially born." Ohio Rev.Code § 2919.151(G). "Partially born" is defined to mean that, in a breech presentation, "at least the lower torso to the navel, but not the entire body, of an intact fetus" and in a cephalic presentation, "at least the complete head, but not the entire body, of an intact fetus," has been intentionally extracted from the body of the mother. Ohio Rev.Code § 2919.151(A)(4); Ohio Rev.Code § 2919.151(A)(3)(b). A person who unlawfully performs the "partial birth procedure" is guilty of the crime of "partial birth feticide," which is second-degree felony. Ohio Rev.Code § 2919.151(D). In addition, such a person may face civil liability for compensatory and punitive damages. Ohio Rev.Code § 2307.53(B).

The express intent of the Ohio General Assembly in enacting HB 351 is "to prevent the unnecessary death of fetuses when they are substantially outside the

---

**6.** Although the Act purports to draw a distinction between the "dilation and evacuation" and "dilation and extraction" methods of abortion, the Court previously noted that the attempted distinction is of little significance, given that HB 351 fails to define either of these procedures. *See Women's Medical Professional Corp.*, 114 F.Supp.2d at 685 n. 25.

body of the mother." *See* Am. Sub. H.B. 351 at Section 3(A). This intent is based in part on Ohio's asserted interest in "maintaining a strong public policy against infanticide, regardless of the life expectancy or stage of development of the child." *Id.* at Section 3(B). According to the Ohio General Assembly, the Act "also furthers the state interest in preventing unnecessary cruelty" to a fetus. Regardless of the ability of a fetus to experience pain, HB 351 expresses the General Assembly's belief that "[t]he indignity of being partially delivered before being deliberately killed is also a form of cruelty that should not be unnecessarily inflicted upon any being of human origin." *Id.* at Section 3(D).[7]

## B. Analysis of Plaintiffs' Constitutional Challenges to HB 351

Having reviewed the substantive provisions of HB 351, the Court turns now to the specific constitutional challenges advanced by the Plaintiffs.

### 1. Vagueness and Scienter Challenges to HB 351

In their Complaint, the Plaintiffs allege that HB 351 is unconstitutionally vague and that it lacks adequate scienter standards. (Doc. #1 at ¶ 60–67). In their most recent Memoranda, the Plaintiffs fail to address the Court's rejection of these "vagueness" and "scienter" arguments at the preliminary injunction stage. (*See* Doc. #51, 55). Although the Plaintiffs have not waived these issues in the permanent injunction context, they merely incorporate by reference the same legal arguments that the Court had previously rejected. (Doc. #51 at 1). Given the Plaintiffs' failure to present any new law or argument with respect to their "vagueness" challenge to the constitutionality of HB 351, or with respect to their challenge to the adequacy of the Act's "scienter" standards, the Court remains convinced, for the reasons set forth in its preliminary injunction ruling, that HB 351 is not unconstitutionally vague and that it contains adequate scienter standards. *See Women's Medical Professional Corp.*, 114 F.Supp.2d at 685 n. 25, 697–704. Accordingly, the Plaintiffs are not entitled to declaratory or injunctive relief on those grounds.

### 2. Constitutionality of Ban on "Partial Birth Procedure" Before Fetal Viability

██ The Plaintiffs' Complaint also alleges that HB 351 unconstitutionally restricts the ability of women to obtain a pre-viability abortion. According to the Plaintiffs, the Act does so in two ways. *First*, it imposes an "undue burden" on women who seek to terminate a pregnancy prior to fetal viability.[8] *Second*, it lacks an ade-

---

**7.** For purposes of its analysis herein, the Court will presume the legitimacy of the state interests articulated by the Ohio General Assembly, just as it did in its preliminary injunction ruling. *See Women's Medical Professional Corp.*, 114 F.Supp.2d at 705–06 n. 55. Contrary to the Defendants' belief, in so doing, the Court *is not* ignoring the Supreme Court's recognition of the State's substantial interest in potential life throughout pregnancy. (*See* Defendants' Post–Trial Brief, Doc. #49 at 46) (asserting that "the Court's focus in the preliminary injunction decision[ ] was totally on the interests of the mother, and on the mother's right to have an abortion"). To

the contrary, the Court has *presumed the validity* of the State's asserted interests. If the interests expressed by the Ohio General Assembly in HB 351 were not legitimate interests, then that fact alone would render the Act unconstitutional. Thus, it is only because the Court has presumed the validity of the Defendants' asserted State interests that it is necessary to examine the other issues raised by the parties.

**8.** The Supreme Court has explained that the phrase "undue burden" is " 'shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial ob-

quate exception allowing the "partial birth procedure" to be performed when it is necessary to preserve a woman's health. (Doc. # 1).

In the preliminary injunction context, the Court rejected the Plaintiffs' first argument, finding no substantial likelihood that HB 351 imposes an undue burden on a woman's ability to obtain a pre-viability abortion. In particular, the preliminary injunction evidence failed to persuade the Court that the Act likely imposes an undue burden by sweeping within its reach not only the "partial birth procedure" but also the commonly performed dilation and evacuation ("D & E") method of abortion. With respect to the Plaintiffs' second argument, however, the Court did find a substantial likelihood that the Act's health exception is unconstitutionally narrow.

In the permanent injunction context, the Plaintiffs now challenge the Court's preliminary conclusion regarding the undue burden issue, and the Defendants contest the Court's finding that the Act's health exception is likely too narrow. After reviewing the full record on the merits, however, the Court continues to believe that, in the pre-viability context, HB 351's health exception is unconstitutional, on its face, in light of the Supreme Court's recent ruling in *Carhart*. As a result, the Court need not revisit its prior determination that the Plaintiffs failed to show a substantial likelihood of success on the merits regarding the undue burden issue. With respect to women who seek to obtain a pre-viability abortion, HB 351's unconstitutionally narrow health exception, alone, renders the Act's ban on the "partial birth procedure" fatally defective.[9] Consequently, the Court will not, because it need not, decide whether the Act is also unconstitutional, in the pre-viability context, on the alternative basis that it imposes an undue burden by banning the commonly performed D & E method of abortion.[10] *See*

---

stacle in the path of a woman seeking an abortion of a nonviable fetus.' " *Carhart*, 530 U.S. at 921, 120 S.Ct. 2597.

9. In short, the Court's analysis of the health exception obviates the need for it to address the Plaintiffs' separate "undue burden" arguments. As will be explained more fully, *infra*, without respect to the undue burden issue, HB 351 is unconstitutional, in the pre-viability context, because it requires physicians either to perform a dismemberment abortion or to take action to cause fetal demise prior to performing an intact procedure. For the reasons set forth herein, the Court finds that performing a dismemberment abortion or causing fetal demise may be riskier than performing the "partial birth procedure," as defined in HB 351. The Court also notes, however, that *if* the act of injecting a woman with a substance such as digoxin or severing the umbilical cord *did not* create *any* risk to her health, then requiring her to undergo either procedure before having an intact abortion could not possibly impose an "undue burden" under *Planned Parenthood v. Casey*, 505 U.S.

833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (noting that an "undue burden" exists when a statute has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion"); *see also Carhart*, 530 U.S. at 921, 120 S.Ct. 2597 (discussing the "undue burden" standard). Indeed, if requiring a simple digoxin injection or severing the umbilical cord imposed *no health risks* whatsoever, the Court discerns no reason why the State of Ohio could not require either procedure for *all* abortions. As a result, it is fair to say that the entire dispute in the present case boils down to one issue, namely whether the act of injecting a pregnant woman with a feticidal agent such as digoxin or severing the umbilical cord carries with it any health risks, without any corresponding health benefit to a woman. For the reasons set forth more fully, *infra*, the Court concludes that it does. In light of this conclusion, the Court need not delve into the thorny issue of whether HB 351 is unconstitutional, because its ban on the "partial birth procedure" encompasses the commonly performed D & E method of abortion.

*Planned Parenthood of Central New Jersey v. Farmer,* 220 F.3d 127, 145–46 (3rd Cir.2000) (declining to address alternative argument regarding constitutionality of health exception in a New Jersey statute banning "partial birth abortions" after declaring statute unconstitutional for another reason); *Harris v. Champion,* 15 F.3d 1538, 1568 (10th Cir.1994) (noting that "once the court determines that a [constitutional] violation has occurred that warrants ... relief, it need not address the other constitutional issues"); *Johnson v. American Credit Co. of Georgia,* 581 F.2d 526, 534–35 (5th Cir.1978) (same); *see also Consolidated Edison Co. of New York, Inc. v. Pataki,* 117 F.Supp.2d 257, 270 n. 6 (N.D.N.Y.2000) (declining to address alternative constitutional claims in the permanent injunction context after finding statute unconstitutional on equal protection and bill of attainder grounds). Instead, the Court will turn directly to an analysis of HB 351's health exception, an issue which is dispositive of the Plaintiffs' pre-viability challenge to the constitutionality of the Act.

In analyzing the health exception, the Court begins with a detailed review of its preliminary injunction ruling. Therein, the Court addressed the constitutionality of the Act's pre-viability health exception as follows:

> In a second argument, the Plaintiffs contend that HB 351 is unconstitutional, insofar as it prohibits the pre-viability performance of the "partial birth procedure," because it lacks an adequate exception for the health of the woman. Although HB 351 generally prohibits a woman from undergoing the "partial birth procedure," it does provide an exception when either her life or health is at risk. Specifically, the Act prohibits

the partial birth procedure, unless it is "necessary in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(C). The Act defines the phrase "serious risk of the substantial and irreversible impairment of a major bodily function" to mean "any medically diagnosed condition that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(A)(5).

In support of their Motion for a Preliminary Injunction, the Plaintiffs contend that the foregoing exception is unconstitutional because, among other things, it is limited to a medically diagnosed *condition* that complicates a woman's pregnancy. They insist that the Act's health and life exception must allow the "partial birth procedure" not only when a medically diagnosed condition makes that method of abortion necessary, but also when that *procedure* is simply safer than any other alternative. In particular, they contend that "a health and life exception may not be limited only to those conditions that relate to pregnancy [or the pregnancy itself], but must instead be encompassing of all possible conditions that could potentially threaten the overall health or life of a woman, *including the choice of abortion procedure.*" (Doc. # 2 at 21) (emphasis added). In response, the Defendants essentially advance two arguments. *First,* they contend that the State of Ohio is not required to grant

---

**10.** The Plaintiffs also argue that HB 351 imposes an undue burden for several other reasons which the court need not address, given its ruling on the health exception issue.

physicians unfettered discretion to choose their favorite abortion procedure. *Second,* they assert that the health exception in HB 351 is constitutional, because it covers "any medically diagnosed condition," and not just complications of the pregnancy itself. (*See, e.g.,* Doc. # 12 at 16–20, 24–25).

Upon review, the Court finds the Supreme Court's recent ruling in *Carhart* to be dispositive. As noted, *supra,* the *Carhart* Court reaffirmed the *principle* that a "State may promote but not endanger a woman's health when it regulates the methods of abortion." *Carhart,* 120 S.Ct. at 2609. As a result, a statute regulating a method of abortion must include an exception " 'where it is necessary in appropriate medical judgment for the preservation of the life or health of the mother[.]' " *Id.* (quoting *Casey,* 505 U.S. at 879, 112 S.Ct. 2791, 120 L.Ed.2d 674). As this Court has explained, the *Carhart* majority expressly rejected the proposition that a health exception need only cover situations in which a woman's pregnancy itself creates a threat to her health. *Id.* Rather, the Court explained:

> [o]ur cases have repeatedly invalidated statutes that in the process of regulating the *methods* of abortion, imposed significant health risks. They make clear that a risk to a women's health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely....

*Id.*

The *Carhart* Court also adopted a broad reading of the phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.* at 2612. As noted, *supra,* the Court reasoned that the phrase

cannot refer to an absolute necessity or to absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases. Neither can that phrase require unanimity of medical opinion. Doctors often differ in their estimation of comparative health risks and appropriate treatment. And *Casey's* words "appropriate medical judgment" must embody the judicial need to tolerate responsible differences of medical opinion....

*Id.* at 2612.

In light of *Carhart,* the Court finds the Defendants' two arguments to be unpersuasive. With respect to the Defendants' argument that physicians do not enjoy "unfettered discretion" to select their abortion method of choice, the Court does not disagree. *See id.* at 2613. Indeed, if the record supports the proposition that the banned "partial birth procedure" is never "safer" than other alternatives, then the State of Ohio may, quite obviously, ban that procedure, without providing an exception for circumstances in which it is safer than other methods of abortion. However, if substantial medical authority supports the proposition that banning the partial birth procedure could endanger women's health by subjecting them to more risky procedures, then *Carhart* requires HB 351 to include a health exception allowing the procedure to be performed in such cases. *Id.* at 2612–2613. With respect to the Defendants' alternative argument that the health exception in HB 351 is constitutional, because it covers "any medically diagnosed condition," and not just complications of the pregnancy, their argument simply misses the point. The Defendants appear to suggest that the Act would allow

the "partial birth procedure" to be performed when any health condition complicates a woman's pregnancy, regardless of whether the pregnancy caused the health condition. For example, the Court perceives the Defendants' argument to be that HB 351 would permit a "partial birth procedure" if (a) pre-eclampsia or some other complication of pregnancy endangered her health, *and* if (b) a form of cancer wholly unrelated to the pregnancy endangered her health. Although the Defendants' argument may be true, it fails to address *Carhart's* recognition that any prohibition against a particular method of abortion must include an exception allowing the banned procedure to be performed "when it may bring with it greater safety for some patients[.]" *Carhart*, 120 S.Ct. at 2613.

Having rejected the Defendants' arguments, the Court next must review HB 351 to determine whether its health exception does permit the "partial birth procedure" to be performed when it is safer than any alternative. As noted above, the Act allows the banned "partial birth procedure" to be performed only if a woman's life or health is endangered by a "serious risk of the substantial and irreversible impairment of a major bodily function," which means

> *any medically diagnosed condition* that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function.

Ohio Rev.Code § 2919.151(A)(5) (emphasis added).

A plain reading of the foregoing language reveals that it lacks the health exception discussed in *Carhart*. The Act allows the "partial birth procedure" to be performed whenever a medically diagnosed condition so complicates a woman's pregnancy that it threatens the

substantial and irreversible impairment of a major bodily function. Notably absent from HB 351 is language allowing the "partial birth procedure" to be performed in cases where the medical evidence shows that it is simply the safest method of abortion. In light of this omission, the critical issue is whether the record contains medical evidence to support the proposition that the "partial birth procedure" may provide greater safety for some women. *Carhart*, 120 S.Ct. at 2613....

*Women's Medical Professional Corp.*, 114 F.Supp.2d at 685–88 (footnotes omitted).

In the permanent injunction context, the Defendants once again assert that the pre-viability health exception in HB 351 satisfies the requirements of *Carhart*. Although they deny that the "partial birth procedure" is *ever* "safer" than alternative methods of abortion, they argue that the Act's health exception would allow the banned procedure to be performed if that were the case. (Doc. # 49 at 30–33). Specifically, they insist that "even *if* the evidence presented at trial could lead to the conclusion that, in some specific circumstance, the partial birth procedure might be safer [than available alternatives], ... H.B. 351 is constitutional because the health exception included in the law would allow it to be performed when necessary, in reasonable medical judgment, to preserve the mother's life or health. That is all the *Carhart* Court said is required." (*Id.* at 30–31).

Upon review, the Court finds the foregoing argument to be unpersuasive. As the Court explained at length in its preliminary injunction ruling, the plain language of HB 351 does not allow the "partial birth procedure" to be performed when it is simply safer than alternative methods of abortion, and *that* is what *Carhart* requires. *See, e.g., Carhart*, 530 U.S. at 937,

120 S.Ct. 2597 (recognizing that a particular method of abortion must be allowed "[w]here a significant body of medical opinion believes [the] procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view ..."). The Court does not quarrel with the Defendants' observation that the Act allows the banned procedure when it is necessary, in reasonable medical judgment, to preserve a woman's life or health. The Defendants fail to recognize, however, that this exception only applies when a woman's life or health is endangered by a "serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(C). The Act defines the phrase "serious risk of the substantial and irreversible impairment of a major bodily function" to mean *"any medically diagnosed condition* that so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(A)(5) (emphasis added). In other words, the Act only allows the "partial birth procedure" to be performed to preserve a woman's health if her health is placed at risk by some medically diagnosed condition. Contrary to the Defendants' assertion, nothing in the Act allows the "partial birth procedure" to be performed when the medical evidence simply shows that it may be the safest method of abortion. As a result, the Act fails to conform with *Carhart's* recognition that any prohibition against a particular method of abortion must include an exception allowing the banned procedure to be performed "when it may bring with it greater safety for

some patients[.]" *Carhart,* 530 U.S. at 937, 120 S.Ct. 2597.

Consequently, as the Court noted in its preliminary injunction ruling, the critical issue is whether the medical evidence supports the proposition that, in some cases, the "partial birth procedure" may be the safest method of pregnancy termination. *Women's Medical Professional Corp.,* 114 F.Supp.2d at 688. In its preliminary injunction ruling, the Court reviewed the evidence then before it and concluded that, in some cases, the "partial birth procedure" did appear to provide greater safety than other methods of abortion. In reaching this conclusion, the Court reasoned as follows: [11]

> In support of their Motion for a Preliminary Injunction, the Plaintiffs argue at length that the D & X method of abortion frequently poses less health risks than the traditional D & E, which involves dismemberment, and the other procedures discussed, *supra.* Based upon its review of the record, the Court finds this argument to be persuasive. In *Voinovich,* this Court had the opportunity to compare the D & X [the banned procedure] to the D & E and other methods of abortion and concluded that the D & X involved less risk to maternal health than other second trimester procedures:

>> After viewing all of the evidence, and hearing all of the testimony, this Court finds that use of the D & X procedure in the late second trimester appears to pose less of a risk to maternal health than does the D & E procedure, because it is less invasive-that is, it does not require sharp instruments to be inserted into the uter-

---

11. For purposes of its analysis herein, the Court first will set forth, in detail, its preliminary injunction ruling regarding the comparative safety of the "partial birth procedure" as opposed to other methods of pregnancy termination. The Court then will revisit this issue and make new findings based on the complete evidentiary record now before it.

us with the same frequency or extent-and does not pose the same degree of risk of uterine and cervical lacerations, due to the reduced use of forceps in the uterus, and due to the removal of any need to crush the skull and remove it in pieces, which can injure maternal tissue.

This Court also finds that the D & X procedure appears to pose less of a risk to maternal health than the use of induction procedures, which require the woman to go through labor, pose additional risks resulting from the injection of fluids into the mother, and cannot be used for every woman needing an abortion.

Finally, the Court finds that the D & X procedure appears to pose less of a risk to maternal health than either a hysterotomy or a hysterectomy, both of which are major, traumatic surgeries.

*Voinovich*, 911 F.Supp. at 1070.

After considering largely the same evidence in the present case, the Court reaches the same conclusion herein. The safety advantages of the D & X over other methods of abortion are both intuitive and well supported by the record. The evidence persuades the Court that the D & X procedure appears to have a number of health and safety advantages over the D & E. Since the D & X method involves the extraction of an intact fetus, it requires fewer instruments to be inserted into the uterus. This results in a lower risk of infection, less blood loss, and a smaller chance of causing trauma to the cervix. (Tr. 9–5–2000 at 39–40; Pl. Exh. 32 at ¶ 10–11; Def. Exh. L at 72, 76–78). It also reduces the possibility of a physician leaving fetal tissue inside the uterus. (Def. Exh. L at 78). Likewise, the D & X procedure appears to have health and

safety advantages over the other abortion techniques. Unlike induction/instillation, the D & X procedure does not require the injection of a saline-type fluid, which may lead to serious medical complications, including amniotic fluid embolus or disseminated intravascular coagulation. (Pl. Exh. 20 at 25). In addition, unlike induction/instillation, the D & X procedure does not require a woman to undergo an extended period of labor. (Pl. Exh. 18 at 42; Pl. Exh. 20 at 25). The D & X method of abortion is also much less traumatic than a hysterotomy or a hysterectomy, both of which are major surgical procedures. (Pl. Exh. 18 at 46; Pl. Exh. 20 at 23). Finally, the American College of Obstetricians and Gynecologists has recognized that the D & X procedure "may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman...." (Def.Exh.B).

In short, the Court concludes, as it did in *Voinovich*, that the D & X procedure appears to have a number of health and safety advantages over other methods of abortion, including the widely performed D & E procedure. As the parties have recognized, however, this conclusion does not completely resolve the issue before the Court. While the D & X procedure, which involves delivery of an intact fetus, may have various health and safety advantages over the D & E, which involves dismemberment, the Defendants properly note that HB 351 *does not* prohibit a physician from partially delivering an intact fetus. Rather, it prohibits the partial delivery of a *living*, intact fetus. As set forth above, *step two* in the sequential four-step "partial birth procedure" banned by HB 351 requires, "in a breech presentation, intentional extraction of at least the lower torso to the navel, but not the entire

body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother[.]" Ohio Rev.Code § 2919.151(A)(3)(b). Although the foregoing language does not specify that the fetus must be alive, *step three* requires "intentional partial evacuation of the intracranial contents of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, intentional compression of the head of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, or performance of another intentional act that the person performing the procedure knows will cause the death of the fetus [.]" Ohio Rev.Code § 2919.151(A)(3)(c). Read together, steps two and three demonstrate that the intact fetus must be *alive* when it is extracted from the body of the mother to the point proscribed by § 2919.151(A)(3)(b). As a result, if a physician delivered an intact, but dead, fetus from the body of the mother, the physician would not violate the Act. Consequently, the Court next must determine whether the record contains medical evidence to support the proposition that performing the "partial birth procedure," which requires the partial delivery of a *live* fetus, may provide greater safety for some women than requiring a doctor to abort an intact, but *dead,* fetus.

In opposition to the Plaintiffs' Motion for a Preliminary Injunction, the Defendants have identified two ways that a doctor could cause fetal demise before performing a D & X, and thereby avoid liability under the Act. *First,* the Defendants have suggested that a doctor might inject a substance known as di-

goxin into the fetus in utero. This procedure, which involves an injection through a woman's abdomen, causes the fetus to die within thirty minutes or less. (Tr. 9–6–2000 at 40; Def. Exh. L at 27). *Second,* the Defendants contend that a doctor might sever the umbilical cord at the outset of a D & X procedure and wait for the fetus to die before removing it intact. Plaintiff Haskell testified that he routinely severs the umbilical cord near the beginning of a D & X abortion. (Tr. 9–6–2000 at 32–34). He also confirmed that he could sever the umbilical cord and wait for fetal demise before even starting the D & X procedure, thereby avoiding liability under HB 351. (*Id.* at 34–35). According to Haskell, severing the umbilical cord would cause the fetus to die within approximately fifteen to thirty minutes. (*Id.*).

Upon review, however, the Court finds that neither of the foregoing options provides any benefit to a woman, and both options involve some increased risk to her health. Aside from the pain associated with the injection, the use of digoxin to cause fetal demise has been acknowledged to involve some health risks to a pregnant woman. Dr. Nancy Romer, a witness for the Defendants, testified that digoxin may cause arrhythmia if it is inadvertently injected into a woman's bloodstream. (Def. Exh. L at 29–30, 94). Likewise, Plaintiff Haskell testified that the risks of a digoxin injection include the possibility of puncturing a blood vessel that continues to bleed internally, or puncturing "a loop of a valve that could get in the way of the needle." (Tr. 9–5–2000 at 73).

The option of severing the umbilical cord and waiting up to thirty minutes for the fetus to die before performing a D & X abortion also increases the risk to a woman's health. The record reveals

that, following dilation (which usually occurs over one or two days), the D & X procedure itself generally takes no more than twenty minutes to complete. (Pl. Exh. 32 at ¶ 12; Pl. Exh. 20 at 33). As a result, requiring a physician to cut the umbilical cord and to wait up to thirty minutes before proceeding further would more than double the length of the procedure, without providing any benefit to the woman. Although Plaintiff Haskell typically performs the D & X procedure with local anesthesia (Tr. 9–5–2000 at 29; Tr. 9–6–2000 at 54), he noted that some doctors use general anesthesia. (Tr. 9–5–2000 at 29). In fact, Dr. John Doe, who is one of four doctors in Ohio utilizing the D & X procedure (Tr. 9–5–2000 at 59), has explained that he uses general anesthesia to perform it. (Pl. Exh. 30 at 44, 81). Dr. Doe has testified, and the Court finds, that the risk to a woman's health is generally greater the longer she is under general anesthesia. (Pl.Ex. 30 at 44). The Court also notes that the use of general anesthesia is associated with various risks, including the possibility of aspiration and vomiting, which may cause a woman to stop breathing. (Pl. Exh. 18 at 46). Consequently, the Court finds, based on the evidence before it, that the risk of harm to a woman's health increases the longer she remains under general anesthesia.

In light of the risks identified above, the Court concludes that the "partial birth procedure," which involves the partial delivery of a *live* fetus, may provide greater safety for some women than requiring a physician to ensure fetal demise before performing an abortion. Indeed, the evidence in the record supports the proposition that banning the "partial birth procedure" could endanger women's health by subjecting them to more risky procedures. As a result, the State of Ohio cannot ban the "partial birth procedure," without providing a health exception for circumstances in which that procedure is safer than requiring a physician to inject digoxin or to cut the umbilical cord and to wait up to thirty minutes to guarantee that the fetus is dead. *Carhart*, 120 S.Ct. at 2609 (recognizing that "a State may promote but not endanger a woman's health when it regulates the methods of abortion"). Given that the health exception in HB 351 does not account for such circumstances, the Court concludes that the Plaintiffs have demonstrated a substantial likelihood of success with respect to their argument that the Act is unconstitutional under *Carhart*, insofar as it limits a woman's ability to obtain a pre-viability abortion.

This conclusion is consistent with case law from other jurisdictions. For example, in *Carhart* itself, the district court rejected an argument that Nebraska's ban on "partial birth abortions" did not impose an undue burden, because physicians could ensure fetal demise before performing the procedure. *Carhart v. Stenberg*, 972 F.Supp. 507, 527–528 (D.Neb.1997). In so doing, the district court specifically discussed, and rejected, the options of causing fetal demise in utero with an injection or cutting the umbilical cord and awaiting fetal demise before continuing with an abortion. The district court concluded that both options resulted in appreciable maternal health risks without a corresponding benefit to the woman. *Id.; see also Evans v. Kelley*, 977 F.Supp. 1283, 1301 (E.D.Mich.1997) (discussing the use of digoxin and the possibility of severing the umbilical cord and concluding that any attempt to ensure fetal demise before beginning an abortion would require additional procedures with potential health risks and no benefit to the

woman); *Planned Parenthood of Central New Jersey v. Verniero*, 41 F.Supp.2d 478, 500 (D.N.J.1998) (recognizing that requiring a physician to ensure fetal demise by injecting digoxin or severing the umbilical cord would involve increased risks to the woman and would result in an undue burden), *aff'd* 220 F.3d 127 (3rd Cir.2000).

Based on the reasoning and citation of authority set forth above, the Plaintiffs have shown a substantial likelihood of success with respect to their argument that HB 351 is unconstitutional, insofar as it prohibits a woman from undergoing a pre-viability "partial birth procedure."
. . .

*Women's Medical Professional Corp.*, 114 F.Supp.2d at 688–92 (footnotes omitted).

In the permanent injunction context, the Plaintiffs do not object to the foregoing analysis. On the other hand, the Defendants argue that the additional evidence presented at the full hearing on the merits demonstrates that the banned "partial birth procedure" *is not* safer than the two primary alternatives, namely an abortion by induction or a D & E abortion. In order to address the Defendants' argument, the Court will first review the process involved in performing: (1) the "partial birth procedure," which is substantially similar to the "D & X" or "intact D & E" method of abortion performed by Plaintiff Haskell [12]; (2) the traditional dismember-

ment-type D & E method of abortion; and (3) the induction method of abortion.[13]

As defined by HB 351, and as previously indicated, the banned "partial birth procedure" involves a four-step "medical procedure that includes all of the following elements in sequence:"

(a) intentional dilation of the cervix of a pregnant woman, usually over a sequence of days;

(b) in a breach presentation, intentional extraction of at least the lower torso to the navel, but not the entire body, of an intact fetus from the body of the mother, or in a cephalic presentation, intentional extraction of at least the complete head, but not the entire body, of an intact fetus from the body of the mother;

(c) intentional partial evacuation of the intracranial contents of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, intentional compression of the head of the fetus, which procedure the person performing the procedure knows will cause the death of the fetus, or performance of another intentional act that the person performing the procedure knows will cause the death of the fetus;

(d) completion of the vaginal delivery of the fetus.

Ohio Rev.Code § 2919.151(A)(3).

The foregoing definition of the "partial birth procedure" is substantially similar to

---

**12.** Although Plaintiff Haskell now refers to his procedure as an "intact D & E" rather than a "D & X," the Court concludes, as it did in its preliminary injunction ruling, that the two terms have essentially the same meaning. As a result, they will be used interchangeably. *See Women's Medical Professional Corp.*, 114 F.Supp.2d at 684 n. 23.

**13.** When discussing different methods of abortion, the Court will use labels such as "D & X," "D & E" and "intact D & E" only to

the extent absolutely necessary. As Dr. Cassing Hammond correctly noted in his testimony before this Court, "the terminology, because [it is] used in various ways, can be somewhat confusing." (Hammond testimony, Doc. # 46 at 355). As a result, to the extent possible, the Court will focus on the specific actions involved in performing the various procedures at issue, just as it did in its preliminary injunction ruling.

Plaintiff Haskell's chosen method of providing abortion services in the mid-to-late second trimester of pregnancy. When performing his procedure, Haskell begins by dilating a woman's cervix slightly with a metal dilator in order to insert small seaweed stalks known as "laminaria." (Haskell testimony, Doc. # 20 at 28). The laminaria cause additional dilation. (*Id.* at 28–29). Haskell frequently replaces them over a period of one or two days to achieve even greater dilation when terminating pregnancies at 20 weeks of gestational age and beyond. (Haskell testimony, Doc. # 46 at 296–98, 302). He also sometimes uses "Cytotec," which is the brand name for a prostaglandin called misoprostol, to assist with dilation and softening of the cervix. (*Id.* at 307–08). Once he is satisfied that sufficient dilation has been achieved, Haskell manually converts the fetus to a breech presentation, if necessary. (Haskell testimony, Doc. # 20 at 45). He then typically injects a local anesthesia and inserts forceps into the uterus to grasp a fetal extremity and to pull it into the vagina. (*Id.* at 29, 35). With adequate dilation, he is capable of extracting the fetus intact up to the skull, which ordinarily lodges in the internal cervical os. (*Id.* at 45). At that point, Haskell forces a pair of scissors into the base of the skull, enlarges the opening and evacuates the contents with a suction catheter. This process results in decompression of the head, allowing Haskell to remove the fetus completely from the body. (*Id.* at 45–46).

In contrast to the foregoing procedure, the traditional D & E method of abortion involves less dilation and results in the removal of a fetus that is not intact. This method of abortion begins with the insertion of laminaria into the cervix to achieve dilation. (Hammond testimony, Doc. # 46 at 455; Jackson testimony, Doc. # 45 at 173). After a degree of dilation is achieved, a paracervical pain blocker is administered. (Hammond testimony, Doc. # 46 at 377). A suction device is then placed through the cervix and into the uterus to remove amniotic fluid. (*Id.;* Jackson testimony, Doc. # 45 at 174). The physician then uses forceps or some other grasping instrument to remove the fetus piece by piece. (Hammond testimony, Doc. # 46 at 378; Jackson testimony, Doc. # 45 at 174; Ballard testimony, Doc. # 47 at 665–66). Once the physician grasps an extremity, he begins pulling it through the cervix and the vagina. (Hammond testimony, Doc. # 46 at 378). During the D & E procedure, dismemberment tends to occur when some portion of the fetus lodges against the internal cervical os. (*Id.* at 379; Jackson testimony, Doc. # 45 at 175). The dismemberment or "disarticulation" is a result of resistance or traction that occurs when an extremity or another part of the fetus lodges against the os. (Hammond testimony, Doc. # 46 at 379). A key distinction between the "partial birth procedure," which is analogous to Haskell's procedure, and a traditional D & E, which involves dismemberment of the fetus, is the amount of dilation required to perform the respective techniques. (Sprang testimony, Doc. # 47 at 505; Ballard testimony, Doc. # 47 at 666). Because the "partial birth procedure" involves the intact extraction of a fetus, it requires a greater degree of dilation than the D & E method of abortion, which results in dismemberment when fetal parts lodge against the internal cervical os. (Sprang testimony, Doc. # 47 at 505).

The third method of abortion sometimes used during the mid-to-late second trimester of pregnancy involves the induction of labor. This process typically includes the use of a prostaglandin such as Cytotec to cause uterine contractions and, eventually, the expulsion of the fetus. (*Id.* at 539; Ballard testimony, Doc. # 47 at 667).

During this process, which may take more than 12 hours to complete, the patient is able to be medicated for comfort. (Sprang testimony, Doc. # 47 at 540–41).

Having reviewed the foregoing procedures, the Court now will assess their relative risks in order to determine whether, in the words of *Carhart,* "a significant body of medical opinion believes [that the 'partial birth procedure'] may bring with it greater safety for some patients, and explains the medical reasons supporting that view[.]" *Carhart,* 530 U.S. at 937, 120 S.Ct. 2597. If so, then the State of Ohio must allow the "partial birth procedure" to be performed when it may provide greater safety for a woman than alternative methods of pregnancy termination. *Id.* at 937–38, 120 S.Ct. 2597. As set forth, *supra,* however, the pre-viability health exception in HB 351 *does not* allow the "partial birth procedure" to be performed in cases where the medical evidence suggests that it may be the safest method of abortion.[14] Consequently, the critical issue is whether the record contains credible medical evidence to support the proposition that the "partial birth procedure" may provide greater safety for some women. *See Carhart,* 530 U.S. at 937, 120 S.Ct. 2597. If so, then the pre-viability health exception in HB 351 is unconstitutionally narrow.

After reviewing all of the documentary evidence and hearing all of the testimony, the Court finds that the record *does* support such a proposition. During the January, 2001, full hearing on the merits in this case, Dr. LeRoy Sprang, a witness for the Defendants, testified that he is unaware of any medical circumstances under which the D & X procedure would be "the only available option to provide termination of [a] pregnancy." (Sprang testimony, Doc. # 47 at 500). The issue, however, is not whether the D & X is ever the only available alternative. Rather, the proper inquiry is whether the D & X or "partial birth procedure" is ever the *safest* alternative. The Court harbors no doubt that a physician always could perform some procedure other than the D & X or "partial birth procedure." Under *Carhart,* however, the State of Ohio cannot ban the "partial birth procedure" in cases where it may offer comparative safety advantages for women, regardless of the availability of other acceptable procedures.

Notably, Dr. Sprang also testified that he does not believe the D & X procedure is *ever* any safer than other available methods of pregnancy termination. (*Id.* at 501). When comparing the relative safety of the D & E and D & X procedures, Dr. Sprang expressed his opinion that the D & X is "more risky." (*Id.* at 520). At a minimum, he believes that the two procedures "are equally risky[.]" (*Id.*). In reaching this conclusion, Dr. Sprang indicated that the additional dilation required for an intact procedure increases the risk of trauma to the cervix. (*Id.* at 504–06). He also testified that the repeated insertion of laminaria into the cervix, as is typically required for an intact procedure, heightens the risk of infection. (*Id.* at 507–08, 548–49). In addition, the doctor expressed his belief that Plaintiff Haskell's performance of the podalic version,[15] which is sometimes required in his variant of the

---

14. To the contrary, as the Court explained, *supra,* the health exception in HB 351 only allows the "partial birth procedure" to be performed when some "medically diagnosed condition" so complicates the pregnancy that it threatens the substantial and irreversible impairment of a major bodily function.

15. The "podalic version" involves converting a fetus from a vertex or "head first" presentation into a footling presentation. (Sprang testimony, Doc. # 47 at 511).

D & X, may cause complications such as a uterine rupture or amniotic fluid embolus. (*Id.* at 511–12). Finally, Dr. Sprang stated that the use of a sharp instrument to puncture the fetal skull, as Plaintiff Haskell does when performing an intact abortion, involves a risk that is not present with the D & E, which involves dismemberment. (*Id.* at 610).

Another defense witness, Dr. Charles Ballard, indicated that he could not envision any circumstances under which the "partial birth procedure" "would be the preferred means [of terminating a pregnancy] as opposed to the other available means of abortion...." (Ballard testimony, Doc. #47 at 679). Dr. Ballard also identified what he perceives as several health risks associated with the D & X or "partial birth procedure." *First*, as noted above, the D & X procedure requires increased dilation, which he believes heightens the risk of cervical incompetence and the resulting loss of future pregnancies. (*Id.* at 679, 735). *Second*, Dr. Ballard expressed his belief that performing the "podalic version," the process of rotating a fetus in order to perform the D & X or "partial birth procedure," increases the risk of a physician rupturing a woman's uterus.[16] (*Id.* at 680–81, 731). *Third*, according to Dr. Ballard, the use of serial laminaria to achieve the additional dilation required for the "partial birth procedure" increases the risk of infection. (*Id.* at 683). *Finally*, Dr. Ballard pointed out the risk of a live birth when a D & X abortion is performed. (*Id.* at 670). Dr. Ballard also agreed, however, that in the absence of controlled studies, which do not exist, the relative advantages and disadvantages

of the intact procedure in specific circumstances remain unknown. (*Id.* at 718–19).

In contrast to the foregoing testimony, other witnesses at the January, 2001, full hearing on the merits testified that the D & X or "partial birth procedure" may provide health and safety advantages for some women. Dr. Rein Siiner, a witness for the Plaintiffs, testified that he has performed approximately 300 induction abortions, and that the average time required to complete the procedure is 19 hours. (Siiner testimony, Doc. #45 at 25). By comparison, after achieving proper dilation, Dr. Siiner is capable of evacuating the uterus within 15 minutes and sending a woman home within one hour of performing his "intact D & E" procedure. (*Id.*). In addition, Dr. Siiner stated that elective, labor-induction abortions are not permitted at the Ohio hospital where he has privileges, and they are significantly more expensive than his intact method of terminating a pregnancy. (*Id.* at 24). Dr. Siiner also testified that Cytotec, the most common agent for inducing labor, has been known to cause nausea, vomiting and diarrhea. (*Id.* at 25–26).

Concerning the relative advantages of his intact procedure over the dismemberment D & E, Dr. Siiner expressed his belief that the intact method results in less uterine and cervical injury, less blood loss and a decreased incidence of a complication known as disseminated intravascular coagulation or "DIC." (*Id.* at 31, 37–38, 40–41). He also noted that his intact procedure is quicker than a dismemberment D & E, reducing the time that a patient is under general anesthesia.[17]

---

16. Dr. Ballard is unaware, however, of any reported instances of an actual uterine rupture as a result of the podalic version being performed during an abortion at 18 to 24 weeks of pregnancy. (Ballard testimony, Doc. #47 at 705).

17. Unlike many abortion providers, Dr. Siiner typically uses general anesthesia when performing his intact procedure. (Siiner testimony, Doc. #47 at 820).

Plaintiff Haskell also testified about the relative advantages of his intact procedure. In so doing, he expressed his belief that, for some women, "it would be safer to extract the fetus to the navel as opposed to disarticulating the fetus prior to that point." (Haskell testimony, Doc. # 46 at 323). In support of this position, Plaintiff Haskell explained that extracting an intact fetus results in fewer instrument passes into a woman's body, which is advantageous from a safety standpoint. (*Id.* at 323, 326). According to Haskell, "[i]t's a well established axiom in the circles of physicians doing D & E's that the less instrumentation, the better, and the more intactness means that there's less instrumentation." (*Id.* at 326).

Another witness for the Plaintiffs, Dr. Cassing Hammond, expressed his belief that the induction method of abortion may be riskier than either the D & X or the D & E. (Hammond testimony, Doc. # 46 at 391–97). As an initial matter, Dr. Hammond noted that the time required to complete an induction abortion is long and unpredictable. Even when using Cytotec, he "routinely [has] patients who choose a labor induction and they will sit on the labor floor for twenty-four, forty-eight [or even] seventy-two hours." (*Id.* at 393). This drawn-out process may be "emotionally draining" for women who are aborting a pregnancy due to fetal anomalies. (*Id.*). According to Dr. Hammond, "[i]t's much harder for those patients to actually go through that procedure, even though it may sound more aesthetic to a layperson, than coming in, getting the cervix prepped, and undergoing what would be about a typically twenty-minute procedure after which they are done and which has, at the very least, similar profiles if not better safety profiles to the induction of labor." (*Id.* at 393–94). In other words, even though an induction procedure *may seem* more appealing to a woman than a D & E

or a D & X abortion, Dr. Hammond believes that, in reality, it is not. In addition, the doctor testified that "[t]here's also some data suggesting that the risk of hemorrhage and infection may be higher in some of those patients who are getting induced[,] depending on the agent [used.]" (*Id.* at 394). Finally, Dr. Hammond noted that "about fifteen to thirty percent of patients who get induction terminations may eventually wind up with a surgical termination to evacuate the placenta, so they kind of wind up with the worst of both worlds." (*Id.*). In other words, "[t]hey come in, they undergo sometimes a very long termination, and then they still have to have somebody ... come in and eventually do [a surgical procedure] to reach in and take the afterbirth out since it has not come out." (*Id.*). Nevertheless, Dr. Hammond recognized that an induction abortion could be the most appropriate procedure for some women. (*Id.* at 395). He lacks the data, however, to determine who might benefit from an induction abortion, and he believes that whether induction is preferable to other methods of pregnancy termination "is ultimately a decision that doctors make in concert with a patient...." (*Id.* at 392).

In addition, based on the evidence submitted in the preliminary injunction phase of this case, the Court itself noted several apparent health and safety advantages of an intact abortion as opposed to a dismemberment procedure or the induction of labor. In particular, the Court reasoned, in part, as follows:

> The safety advantages of the D & X over other methods of abortion are both intuitive and well supported by the record. The evidence persuades the Court that the D & X procedure appears to have a number of health and safety advantages over the D & E. Since the D & X method involves the extraction of an

intact fetus, it requires fewer instruments to be inserted into the uterus. This results in a lower risk of infection, less blood loss, and a smaller chance of causing trauma to the cervix. (Tr. 9–5–2000 at 39–40; Pl. Exh. 32 at ¶ 10–11; Def. Exh. L at 72, 76–78). It also reduces the possibility of a physician leaving fetal tissue inside the uterus. (Def. Exh. L at 78). Likewise, the D & X procedure appears to have health and safety advantages over the other abortion techniques.... [U]nlike induction/instillation, the D · & X procedure does not require a woman to undergo an extended period of labor. (Pl. Exh. 18 at 42; Pl. Exh. 20 at 25).... Finally, the American College of Obstetricians and Gynecologists has recognized that the D & X procedure "may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman...." (Def.Exh.B).

*Women's Medical Professional Corp.*, 114 F.Supp.2d at 688.[18]

After reviewing all of the evidence and testimony now before it, the Court continues to believe that, for some women, an intact pregnancy termination, such as the "partial birth procedure" defined in HB 351, may bring with it greater safety than other available options. In reaching this conclusion, the Court notes that it has found the testimony from each witness in this case (whether testifying for the Plaintiffs or the Defendants) to be credible. Indeed, all of the experts who testified in this proceeding appear to have spoken honestly and sincerely, expressing their medical opinions with candor. In addition, all of the experts presented plausible explanations for·their views concerning the relative safety of the abortion procedures at issue. Given this substantial disagreement, even among the accomplished physicians who testified in this proceeding, the Court would be hard pressed to say, with confidence, that an intact abortion method such as the "partial birth procedure" is always, or is never, "safer" than other available options. What the record clearly does reveal, however, is the presence of uncertainty and conflicting medical opinions and evidence regarding the relative safety and advantages of the D & X or "partial birth procedure." This uncertainty leads the Court to conclude that the "partial birth procedure" may be safer for some women. The existence of such uncertainty is also precisely why the State of Ohio must allow the "partial birth procedure" to be performed when a physician believes that it may provides greater safety for a patient. Indeed, as the *Carhart* Court explained when discussing Nebraska's attempt to ban "partial birth abortions":

... Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases.... Doctors often differ in their estimation of comparative health risks and appropriate treatment. And *Casey's* words "appropriate medical judgment" must embody

---

**18.** In its September 22, 2000, preliminary injunction ruling, the Court also determined that the D & X procedure was safer than induction, because the latter procedure requires the injection of a saline-type fluid. *See Women's Medical Professional Corp.*, 114 F.Supp.2d at 688. Based on the additional evidence presented at the January, 2001, full hearing on the merits, however, the Court finds that induction abortions typically *do not* involve the injection of a saline-type fluid. The testimony from the January, 2001, hearing persuades the Court that induction abortions typically now involve the use of Cytotec or a similar agent, and not a saline-type fluid, which was used predominantly in earlier years. (Siiner testimony, Doc. # 45 at 25).

the judicial need to tolerate responsible differences of medical opinion. . . .

For another thing, the division of medical opinion about the matter at most means uncertainty, a factor that signals the presence of risk, not its absence. That division here involves highly qualified knowledgeable experts on both sides of the issue. Where a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary. Rather, the uncertainty means a significant likelihood that those who believe that D & X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences. If they are wrong, then the exception will simply turn out to have been unnecessary.

*Carhart*, 530 U.S. at 937, 120 S.Ct. 2597.[19]

In short, the Court finds, just as it did in its preliminary injunction ruling, that an intact method of abortion, such as the "partial birth procedure," may provide greater safety for some women than a dismemberment or induction procedure. In reaching this conclusion, the Court notes that *Carhart* does not require proof, by the preponderance of the evidence, that a given method of abortion *actually does* provide greater safety for some women, either in a given case or generally. To the contrary, the Court expressly recognized that when, as in the present case, "a significant body of medical opinion believes that a procedure *may* bring with it greater safety for some patients and explains the medical reasons supporting that view," a reviewing court must "tolerate responsible differences of medical opinion[.]" *Carhart*, 530 U.S. at 937, 120 S.Ct. 2597 (emphasis added). In addition, the *Carhart* Court noted that when, as in the present case, "substantial medical authority supports the proposition that banning a particular abortion procedure *could* endanger women's health,[20] *Casey* requires [a state statute] to include a health exception," allowing the procedure to be performed when it "*may* bring with it greater safety for some patients" or when it "is a safer method of abortion[.]"[21] *Id.* at 937–38, 120 S.Ct.

---

**19.** The statute in *Carhart* lacked any exception allowing a "partial birth abortion" in order to preserve a woman's health. In the present case, HB 351 does include a health exception. However, as explained more fully herein, the exception is unconstitutionally narrow. It allows the banned "partial birth procedure" to be performed only when a medically diagnosed condition complicates the pregnancy and places a woman's health at risk. The exception fails to allow the banned procedure to be performed in situations where the medical evidence persuades a physician that it is simply the safest method of abortion. For the reasons set forth herein, the Court concludes that such an exception is necessary.

**20.** Parenthetically, the Court notes that "substantial medical authority" may be somewhat less than the "preponderance of the evidence." Indeed, "[s]ubstantial evidence is

... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "[I]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *See, e.g., Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir.1996).

**21.** This is not to say, however, "that a State is prohibited from proscribing an abortion procedure whenever a particular physician deems the procedure preferable." *Carhart,* 530 U.S. at 938, 120 S.Ct. 2597. "By no means must a State grant physicians 'unfettered discretion' in their selection of abortion methods." *Id.* "But where substantial

2597 (emphasis added). In short, the *Carhart* Court explained that such a health exception is required, when, as in the present case, "uncertainty" exists, as a result of disagreement among "highly qualified knowledgeable experts on both sides of the issue."[22] *Id.* at 937, 120 S.Ct. 2597.

In opposition to the foregoing conclusion, the Defendants advance several arguments that warrant a brief discussion. *First,* they contend that Plaintiff Haskell has admitted "that he has never considered the intact D & E/D & X procedure to be medically necessary to save the mother's life or to protect her health, and he has never encountered a situation where the intact procedure was in fact medically necessary to preserve a woman's life or health." (Doc. # 49 at 16). Even if this assertion is true, however, the Defendants have not shown that Plaintiff Haskell interpreted the phrase "medically necessary" in the same way that the *Carhart* Court defined it. As the Supreme Court explained in that case, the term "necessary" does not refer to "absolute necessity[.]" *Carhart,* 530 U.S. at 937, 120 S.Ct. 2597. Indeed, under *Carhart,* the "partial birth procedure" may be "medically necessary," in the pre-viability context, if it is simply safer than other methods of abortion. *Id.* ("The word 'necessary' ... cannot refer to an absolute necessity or to

absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases."); *see also id.* (recognizing that a particular method of abortion must be allowed "[w]here a significant body of medical opinion believes [the] procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view ...."). Plaintiff Haskell consistently has testified that his intact abortion procedure *is* safer than other alternatives.

*Second,* the Defendants contend that the complication rates for intact and dismemberment abortions are virtually identical. (Doc. # 49 at 16). Even if this assertion is true, the fact that the two procedures have similar overall complication rates does not mean that the intact method is never safer in a given case.

*Third,* the Defendants argue that Haskell's testimony concerning his lack of major complications with his intact procedure is "not valid," because it is based on his own memory and cannot be verified. In support of this proposition, the Defendants cite the testimony of Dr. Jackson. (Doc. # 49 at 17). However, Dr. Jackson did not testify that a physician's undocumented personal experiences are invalid. Rather,

---

medical authority supports the proposition that banning a particular abortion procedure could endanger women's health, *Casey* requires the statute to include a health exception when the procedure is 'necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" *Id.* (quoting *Casey,* 505 U.S. at 879, 112 S.Ct. 2791). In other words, *Casey* requires the statute to include an exception, allowing the procedure when a "significant body of medical opinion believes that [the] procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view...." *Id.* at 937, 120 S.Ct. 2597.

22. In addition, given that Haskell, like the plaintiff in *Carhart,* has asserted a facial challenge to the constitutionality of HB 351, it is not necessary for him to prove that the "partial birth procedure" is actually safer in a specific case involving a particular woman. Instead, as noted above, he may prevail on his facial challenge if he presents a "significant body of medical opinion" or "substantial medical authority" to support the proposition that the banned "partial birth procedure" may provide greater safety in some circumstances. *Carhart,* 530 U.S. at 937–38, 120 S.Ct. 2597.

she stated that such "expert opinion" is less reliable than clinical trials and other more formal methods of research. (Jackson testimony, Doc. # 45 at 140, 182–83). Indeed, Dr. Jackson noted that "expert opinion" or "expert experience" is "what most of medicine is based on." (*Id.* at 145–46).

*Fourth,* the Defendants note that "there is no mainstream, peer-reviewed literature in the obstetrics and gynecology [field] which documents the safety or complications or experience with the intact D & E/D & X, or compares its safety to other second trimester abortion procedures." (Doc. # 49 at 18). Although the Court does not dispute this assertion, the Supreme Court has found the absence of such "general medical studies documenting comparative safety" to be of little significance. *Carhart,* 530 U.S. at 935, 120 S.Ct. 2597.

*Fifth,* the Defendants note that intact abortions are not performed at leading medical institutions such as San Francisco General Hospital or the University of Southern California Medical Center. (Doc. # 49 at 18). From that fact, the Defendants infer that "[i]f the intact procedure was truly safer, it would have been enthusiastically embraced by these two institutions, yet to this day neither performs it." (*Id.*). Despite the superficial appeal of this argument, the Court is not convinced that the Defendants' inference is necessarily accurate. In her testimony, Dr. Jackson explained why the intact procedure is not performed at her hospital, San Francisco General:

> [It's] [b]ecause none of the clinicians who works there has ever been trained in doing them, so they have never taught others to do them.... The fact that we're well respected, it's a matter of what you are trained to do, and all of our physicians have been trained to do

D & E, and none of them ha[s] been trained to do the other [intact] procedure.

(Jackson testimony, Doc. # 45 at 175–76).

In other words, the fact that some doctors do not use the intact method of abortion may signal nothing more than their lack of training, rather than the lack of any health or safety advantages associated with the procedure. It is also possible, of course, that doctors at San Francisco General or elsewhere truly do not believe that an intact procedure is safer than other alternatives. Indeed, the testimony in the present case demonstrates that some physicians do hold such a view. That fact, however, does not mean that doctors who believe otherwise are necessarily wrong. *See Carhart,* 530 U.S. at 937, 120 S.Ct. 2597 ("Where a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary. Rather, the uncertainty means a significant likelihood that those who believe that D & X is a safer abortion method may turn out to be right.").

*Finally,* the Defendants argue that "the testimony at trial completely refuted the various claims made by Plaintiffs as to their theories of why the intact procedure is safer[.]" (Doc. # 49 at 18). In particular, the Defendants contend that the intact procedure does not reduce the risk of injury from "bony fragments." They also argue that the danger from multiple instrument passes into the uterus, as is typically required in a dismemberment procedure, can be "avoided" with the use of ultrasound. In addition, the Defendants contend that Plaintiff Haskell's intact procedure may result in uterine damage. The also argue that the intact procedure does

not prevent a complication known as "DIC." (*Id.* at 19–20).

With respect to the Defendants' first assertion, the Court agrees that a dismemberment abortion usually does not create a risk of injury from "bony fragments." When a surgeon grasps an extremity and applies traction, the dismemberment typically occurs at a joint, which is covered with soft cartilage. (Sprang testimony, Doc. # 47 at 622–24). With respect to the Defendants' second assertion, however, the Court cannot agree that the intact procedure fails to reduce the risk associated with instrument passes inside the body. In support of their argument, the Defendants contend that the use of ultrasound "avoids" the risk of injury from repeatedly inserting instruments into the body during a dismemberment abortion. Although the use of ultrasound may *help* to prevent such injuries, the Court is unpersuaded that it eliminates the risks entirely. As a result, the Court finds that avoiding such multiple instrument passes, by performing the intact procedure, appears to be safer than performing a dismemberment abortion with ultrasound. With respect to the Defendants' third argument, the Court agrees that Plaintiff Haskell's intact procedure may result in uterine damage, particularly if insufficient dilation is achieved. The fact that the intact procedure is not risk-free, however, does not mean that it is never comparatively less risky than other alternatives. Finally, with respect to the Defendants' fourth argument, it is not particularly important whether intact abortions prevent DIC. As set forth above,

intact procedures may provide greater safety for some women by eliminating or reducing the need for instrument passes inside the body.

Having rejected the foregoing arguments, the Court remains persuaded that, for some women, an intact pregnancy termination, such as the "partial birth procedure" defined in HB 351, may bring with it greater safety than other available options. As the Court noted in its preliminary injunction ruling, however, this conclusion does not resolve the present litigation:

> ... While the D & X procedure, which involves delivery of an intact fetus, may have various health and safety advantages over the D & E, which involves dismemberment, the Defendants properly note that HB 351 *does not* prohibit a physician from partially delivering an intact fetus. Rather, it prohibits the partial delivery of a *living,* intact fetus.... As a result, if a physician delivered an intact, but dead, fetus from the body of the mother, the physician would not violate the Act.

*Women's Medical Professional Corp.,* 114 F.Supp.2d at 689 (footnote omitted).

As a result, the Court next must "determine whether the record contains medical evidence to support the proposition that performing the 'partial birth procedure,' which requires the partial delivery of a *live* fetus, may provide greater safety for some women than requiring a doctor to abort an intact, but *dead,* fetus." *Id.*[23] If taking action to cause fetal demise before extracting an intact fetus to the point proscribed

---

**23.** In its preliminary injunction ruling, the Court noted that the term "alive" is not synonymous with the term "viable":

> In order for a fetus to be considered "viable" under HB 351, there must be "a realistic possibility of maintaining and nourishing [its] life outside the womb with or without temporary artificial life-sustain-

ing support." Ohio Rev.Code § 2919.151(A)(6); Ohio Rev.Code § 2901.01(B)(C)(ii). Therefore, a fetus may be alive, but not viable, if it lacks a realistic possibility of maintaining life outside the mother....

*Women's Medical Professional Corp.,* 114 F.Supp.2d at 689 n. 31.

by HB 351 would increase the risk to a woman's health, then the State of Ohio may not impose such a requirement. *See Carhart,* 530 U.S. at 931, 120 S.Ct. 2597 (recognizing that a "State may promote but not endanger a woman's health when it regulates the methods of abortion"). With respect to this issue, the parties once again have provided the Court with a great deal of credible, and conflicting, expert medical testimony.[24]

The testimony and other evidence before this Court has focused on two steps that a physician could take to cause fetal demise before performing the "partial birth procedure": (1) injecting a feticidal agent such as digoxin at the outset of the procedure; or (2) severing the umbilical cord before performing the procedure. In the preliminary injunction context, the Court found a substantial likelihood that either approach would increase the risk to a woman's health. *See Women's Medical Professional Corp.,* 114 F.Supp.2d at 689–92. Although the testimony at the January, 2001, full hearing on the merits addressed both injecting digoxin and severing the umbilical cord, the Defendants focus on the former option in their post-trial Brief. (*See* Doc. # 49 at 41–45). Nevertheless, for purposes of completeness, the Court will set forth the pertinent testimony concerning both options, and it will make findings regarding their safety.

With respect to the issue of using digoxin, Dr. Sprang testified that he is familiar with studies in which thousands of women received such injections without any "serious incidents" or "complications." (Sprang testimony, Doc. # 47 at 525–26). Using ultrasound guidance, Dr. Sprang stated that injecting a woman with digoxin is similar to performing an amniocentesis. (*Id.* at 529). The doctor also expressed his belief that ensuring fetal demise with the use of digoxin "has positive emotional benefit[s] to the mother and [is] a much more humane way to do it." (*Id.* at 530). Finally, Dr. Sprang testified that, even if a physician accidentally struck the wall of a bowel or a blood vessel with the needle, the puncture would "just close over." (*Id.* at 532). As a result, he testified that "there's just very minimal, minimal risk." (*Id.*).

Likewise, Dr. Ballard testified that he has injected different chemical agents to cause fetal demise, and he has never seen any complications. (Ballard testimony, Doc. # 47 at 674–75). Dr. Ballard also has not heard of any complications such as hitting a woman's bowel with the needle. (*Id.* at 675). The only complication that the doctor has seen involved striking the umbilical cord and causing bleeding from the placenta. Although such an event may be catastrophic in a context other than pregnancy termination, it is irrelevant when the goal is to abort the pregnancy. (*Id.* at 675–76).

Regarding the use of digoxin to cause fetal demise, another witness, Dr. Hammond, testified that he does not do so as a

---

24. For purposes of its analysis herein, the Court will focus primarily on the testimony and other evidence presented during the January, 2001, full hearing on the merits. With respect to the evidence presented at the preliminary injunction hearing, the Court fully discussed that evidence in its September 22, 2000, ruling. Although the Court has reviewed the preliminary injunction evidence a second time, it need not discuss that evidence again in detail herein. Based on the preliminary injunction evidence, the Court previously found that taking action to cause fetal demise before extracting an intact fetus to the point proscribed by HB 351 may increase the risk to a woman's health. *Women's Medical Professional Corp.,* 114 F.Supp.2d at 690. For the reasons set forth more fully, *infra,* the Court now reaches the same conclusion, based on the evidence presented during the full oral and evidentiary hearing on the merits.

matter of course. In support of his decision, he explained:

> [W]ell, it's the injection of any medication. I don't have evidence that it's particularly a dangerous procedure, but anytime in medicine when you do any kind of procedure, you are supposed to evaluate the risk/benefit ratio, and you only so something if the benefits seem to outweigh the risks.
>
> So before I take any risk, okay, risk at all, taking a needle, putting it inside the uterine cavity, injecting any potentially toxic agent, I need to have a good justification for what I'm doing, and without evidence to suggest that it affects the outcome of the procedure, the safety of the procedure at all, then there's no reason for me to be putting patients through this.

(Hammond testimony, Doc. # 46 at 390).

Likewise, Dr. Hibbert opined during the January, 2001, full hearing on the merits that a woman obtains no benefit from the use of a feticidal agent such as digoxin, and that the procedure involves a small risk. (Hibbert testimony, Doc. # 46 at 274). According to Dr. Hibbert, complications such as amniotic embolism, bleeding and injury to the bowel have occurred as a result of a feticidal agent being injected. (*Id.*). Another witness, Dr. Siiner, testified that, even with the use of a local anesthetic, injecting digoxin through a three-and-one-half inch spinal needle is "uncomfortable." (Siiner testimony, Doc. # 45 at 43). In addition, Dr. Siiner stated that, with or without ultrasound guidance, the needle might inadvertently touch internal structures. (*Id.*). Finally, with respect to the digoxin itself, Dr. Siiner testified that it has no medical benefit to the woman, and it involves some risks, at least in theory. (*Id.* at 44–45). In particular, Dr. Siiner explained:

> [I]f we have an inadvertent intramuscular injection of digoxin, again, I'm not sure what would occur; however, if we have a woman who has preexisting cardiac disease, if we should have rapid absorption, then we could get into arrhythmia problems and that I guess in theory we could even have a cardiorespiratory arrest.

(*Id.* at 45).

Another witness, Dr. Rebecca Jackson, testified regarding a digoxin study that she recently conducted. The study involved approximately 120 women who underwent second trimester D & E abortions. The purpose of the study was to determine whether the use of digoxin to induce feticide prior to the abortions would result in a faster procedure, thereby reducing blood loss and resulting in a lower risk of complications. (Jackson testimony, Doc. # 45 at 147–48, 152–53). Dr. Jackson's results revealed that the use of digoxin did not result in a faster procedure. (*Id.* at 156–57). However, the study did indicate a four-fold increase in vomiting among the women who were injected with digoxin. (*Id.* at 157–58). Although the only "statistically significant" increase in side effects involved vomiting, Dr. Jackson did observe a general trend toward other "higher side effects in the digoxin group[.]" (*Id.* at 158). From a mathematical perspective, however, she lacked a sufficient number of subjects to determine whether the other increased side effects were "statistically significant." (*Id.* at 160–61, 209).

Dr. Jackson also testified concerning general risks that a patient faces when a doctor inserts a needle into the amniotic cavity. (*Id.* at 161). In addition to the risk of a miscarriage, which is not relevant in the context of pregnancy termination, those risks include "a risk of vaginal bleeding, risk of injuring the uterus as you put

the needle through it, [and] the risk of injuring a blood vessel or the bowel as you put the needle into the abdomen[.]" (*Id.*). In addition, Dr. Jackson testified that she has "definitely seen injury to the uterus where probably the digoxin was injected into the myometrium or the muscle of the uterus, which causes severe pain and furthermore makes it very difficult [ ] to know exactly what was injured." (*Id.* at 161–62). In such a case, it is usually necessary to admit the patient to the hospital "to observe [her] for a while to try and sort it out." (*Id.* at 162).

With respect to causing fetal demise by severing the umbilical cord, Dr. Hammond testified that he often does so before extracting an intact fetus to the point prescribed by HB 351. In his opinion, however, he cannot always sever the cord without subjecting a woman to some risk. (Hammond testimony, Doc. # 46 at 403–04). In particular, Dr. Hammond explained that severing the umbilical cord early in the procedure would not place a woman at any measurable risk *if* the cord spontaneously presented itself. (*Id.* at 436). On the other hand, if a physician were required to locate and to sever the cord in all cases, including those in which it did not automatically present itself,[25] the process of locating and cutting the cord would, in Dr. Hammond's opinion, result in some risk of harm to a woman. (*Id.* at 404). Manually gaining access to the umbilical cord would require "reaching into the uterus and wherever the cord is, finding it, dislodging it, and then severing the cord, which involves much more uterine-intrauterine manipulation," a process that could cause perforation of the uterus. (*Id.* at 457–58). In his testimony, Dr. Haskell

agreed that "if instruments are being passed strictly to find the cord, you are increasing the number of instrument passes[,]" which results in some increased risk to the woman. (Haskell testimony, Doc. # 46 at 338).

After reviewing all of the testimony and other evidence now before it, the Court concludes that requiring a doctor to take a step to cause fetal demise before performing the "partial birth procedure" has no medical benefit to a woman and may create some risk to her health. With respect to severing the umbilical cord, the Court finds that such a procedure would cause fetal demise and would allow a physician to perform an intact abortion without violating HB 351. In cases where the umbilical cord spontaneously presented itself, the act of severing the cord likely would not result in increased risk to a woman's health. In cases where the cord did not readily make itself available, however, a physician would be required to insert an instrument into the uterus to find, to dislodge and to sever the cord. This process has no benefit to a woman, and it creates some risk of injury.

With respect to the use of a feticidal agent such as digoxin, the Court notes that the parties once again have presented credible, albeit conflicting, expert testimony. As set forth above, Dr. Sprang and Dr. Ballard do not believe that a digoxin injection creates any perceptible risk to a woman's health. On the other hand, Dr. Hammond expressed his belief that injecting a toxic agent into a woman's body carries with it some inherent risk and, in the case of using digoxin to cause fetal demise, provides absolutely no benefit to a woman. Likewise, Dr. Hibbert and Dr.

25. The Court finds, based on the evidence presented during the full hearing on the merits, that the umbilical cord does not always present itself spontaneously. (*See, e.g.,* Hibbert testimony, Doc. # 46 at 272; Haskell testimony, Doc. # 46 at 309, 311). At times, the umbilical cord does not present itself until after a fetus is extracted to the point prescribed by HB 351. (*Id.* at 314).

Siiner agreed that the use of digoxin to cause fetal demise involves a small risk and no corresponding benefit to a woman. Finally, Dr. Jackson noted that the use of digoxin to cause fetal demise in second trimester abortions resulted in a statistically significant increase in vomiting.[26] Perhaps more importantly, Dr. Jackson observed a general trend toward other side effects among women who received an injection of digoxin. Although Dr. Jackson's study involved too few women to determine whether the increase in these other side effects was "statistically significant," her study does suggest uncertainty, which itself is "a factor that signals the presence of risk, not its absence." *Carhart*, 530 U.S. at 937, 120 S.Ct. 2597. Finally, the Court finds noteworthy Dr. Jackson's testimony that the use of digoxin has been associated with injury to the uterus requiring temporary hospitalization.

In sum, although the Plaintiffs and the Defendants have provided credible testimony on the issue of causing fetal demise, the Plaintiffs' experts have articulated plausible, medically-based explanations for their belief that the act of severing the umbilical cord or injecting a woman with digoxin may create health risks without any corresponding benefit to a woman. As a result, the Court concludes that the "partial birth procedure," which involves the partial delivery of a living fetus, may provide greater safety for some women than requiring a physician to take a step to cause fetal demise before performing the procedure. Consequently, based on this Court's reading of *Carhart*, the State of Ohio cannot ban the "partial birth procedure" without providing a health exception covering circumstances in which that procedure is safer than requiring a physician to take a step to cause fetal demise by, for example, injecting digoxin or severing the umbilical cord.[27] Given that the pre-viability health exception in HB 351 does not account for such situations, the Court finds it to be unconstitutional under *Carhart*.[28]

---

**26.** Dr. Jackson did note, however, that this particular side effect could be controlled with certain medications or even Pepto Bismol. (Jackson testimony, Doc. # 45 at 210).

**27.** As noted, *supra*, this conclusion obviates the need for the Court to address the Plaintiffs' separate "undue burden" arguments. Without respect to the undue burden issue, HB 351 is unconstitutional, in the pre-viability context, because it requires physicians either to perform a dismemberment abortion or to take action to cause fetal demise prior to performing an intact procedure. For the reasons set forth herein, the Court has determined that performing a dismemberment abortion or causing fetal demise may be riskier than performing the "partial birth procedure," as defined in HB 351. However, *if* the act of injecting a woman with a substance such as digoxin or severing the umbilical cord *did not* create *any* risk to her health, then requiring her to undergo either procedure before having an intact abortion could not possibly impose an "undue burden" under *Planned Parenthood v. Casey*, 505 U.S. 833, 877, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

Indeed, if requiring a simple digoxin injection or severing the umbilical cord imposed *no health risks* whatsoever, the Court discerns no reason why the State of Ohio could not require either procedure for *all* abortions. As a result, as noted, *supra*, the crucial issue in the present case is whether the act of injecting a woman with a feticidal agent or severing the umbilical cord may increase the risk to her health, without any corresponding benefit to her health.

**28.** As the Court noted in its preliminary injunction ruling, this conclusion is consistent with case law from other jurisdictions:

... For example, in *Carhart* itself, the district court rejected an argument that Nebraska's ban on "partial birth abortions" did not impose an undue burden, because physicians could ensure fetal demise before performing the procedure. *Carhart v. Stenberg*, 972 F.Supp. 507, 527–528 (D.Neb. 1997). In so doing, the district court specifically discussed, and rejected, the options of causing fetal demise in utero with an injection or cutting the umbilical cord and awaiting fetal demise before continuing

Accordingly, the Court will permanently enjoin the Defendants from enforcing HB 351, insofar as it imposes a ban on the pre-viability performance of the "partial birth procedure."

3. *Constitutionality of Ban on "Partial Birth Procedure" After Fetal Viability*

■ Having found HB 351 to be unconstitutional, insofar as it bans the pre-viability performance of the "partial birth procedure," the Court turns now to the Act's constitutionality, insofar as it bans that procedure after viability.[29] With respect to the post-viability ban on the "partial birth procedure," the Plaintiffs again insist that the Act is unconstitutional, because it lacks an adequate exception for the health of the woman. In its preliminary injunction ruling, the Court agreed, analyzing this issue as follows:

The health exception contained in HB 351 is the same, regardless of the viability of the fetus. As noted, *supra,* the Act bans the "partial birth procedure," unless it is "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the

mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(B). As the Court has explained, this exception applies only when "any medically diagnosed condition ... so complicates the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(A)(5).

For the reasons set forth more fully above, the foregoing exception is constitutionally infirm, in the pre-viability context, because it does not permit a physician to perform the partial birth procedure when it is less risky than any alternative method of abortion. *Carhart,* 120 S.Ct. at 2609, 2612–2613. In other words, in the pre-viability context, a health exception to a statute proscribing a method of abortion must contain two separate components: (1) the banned procedure must be allowed when it is necessary as a result of a medically diagnosed condition; and (2) the banned procedure must be allowed

with an abortion. The district court concluded that both options resulted in appreciable maternal health risks without a corresponding benefit to the woman. *Id.; see also Evans v. Kelley,* 977 F.Supp. 1283, 1301 (E.D.Mich.1997) (discussing the use of digoxin and the possibility of severing the umbilical cord and concluding that any attempt to ensure fetal demise before beginning an abortion would require additional procedures with potential health risks and no benefit to the woman); *Planned Parenthood of Central New Jersey v. Verniero,* 41 F.Supp.2d 478, 500 (D.N.J.1998) (recognizing that requiring a physician to ensure fetal demise by injecting digoxin or severing the umbilical cord would involve increased risks to the woman and would result in an undue burden), *aff'd* 220 F.3d 127 (3rd Cir.2000).
*Women's Medical Professional Corp.,* 114 F.Supp.2d at 691–92 (footnote omitted).

**29.** In its preliminary injunction ruling, the Court concluded that HB 351's pre-viability ban on the "partial birth procedure" was severable from its post-viability ban on that procedure. *Women's Medical Professional Corp.,* 114 F.Supp.2d at 692–93. As a result, the Court proceeded to address the constitutionality of the Act's post-viability ban separately. In the permanent injunction context, the Plaintiffs have not challenged the Court's prior determination on the issue of severability. Consequently, the Court once again concludes, for the reasons set forth in its preliminary injunction ruling, that the Act's pre-viability ban on the "partial birth procedure" is severable from the remainder of the statute. Accordingly, the Court once again will address the Act's post-viability ban separately.

when it is safer than other methods of abortion.

Given that *Carhart* only addressed the health exception issue in the pre-viability context, the Court must determine the implication of that ruling with respect to Ohio Revised Code § 2919.151(B), which prohibits the post-viability performance of the "partial birth procedure," subject to the exception set forth above. In resolving this issue, the Court begins with the well-recognized premise that " 'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, *and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.*' " *Casey,* 505 U.S. at 879, 112 S.Ct. 2791 (quoting *Roe,* 410 U.S. at 164–165, 93 S.Ct. 705) (emphasis added).

Given that the State of Ohio may ban post-viability abortions outright, except where necessary to preserve the life or health of the mother, the two-part health exception identified above must be analyzed in slightly different fashion in the post-viability context. If a State generally may prohibit *all* abortions after a fetus has attained viability, it is incongruous to say that, in the absence of health considerations, an exception must be made whenever one method of abortion is "riskier" than another. In other words, if a health condition does not require a woman to undergo a post-viability abortion, then a State may prohibit her from doing so, period, by any method. The comparative "safety" of one method of abortion over another is simply immaterial, *unless and until* a woman establishes that some health condition requires the termination of her pregnancy. Once a woman who is carrying a viable fetus *does* demonstrate that a health condition requires her to terminate the pregnancy, however, she must be permitted to choose the least risky method. This is so because "a State may promote but not endanger a woman's health when it regulates the methods of abortion." *Carhart,* 120 S.Ct. at 2609. Indeed, it would be irrational to say that any woman who desires an elective abortion in the pre-viability context must be allowed to choose the least risky method available, whereas, in the post-viability context, the State may subject a woman who requires an abortion for health reasons to more deleterious procedures.

The conclusion drawn from the foregoing analysis is that HB 351 fails to provide an adequate health exception in the post-viability context. Although the Act may appear to meet the foregoing requirements, this is manifestly not the case. HB 351 bans the "partial birth procedure" in the post-viability context, unless it is "necessary, in reasonable medical judgment, to preserve the life or health of the mother as a result of the mother's life or health being endangered by a serious risk of the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(B). The Defendants have represented to the Court that this exception is limited to *physical* conditions that "so complicate[ ] the pregnancy of the woman as to directly or indirectly cause the substantial and irreversible impairment of a major bodily function." Ohio Rev.Code § 2919.151(A)(5). The Court agrees with this candid representation, particularly in light of the fact that the language at issue is very similar to the language employed in HB 135, which both this Court and the Sixth Circuit found to cover only physical conditions.

Inasmuch as HB 351 permits women with *physical* health conditions to under-

go the "partial birth procedure," it may appear to survive the constitutional analysis set forth above, but it does not. This Court has recognized that, in the post-viability context, the State may proscribe abortion altogether, except when it is necessary to save the life or health of the woman. *Casey*, 505 U.S. at 879, 112 S.Ct. 2791. Furthermore, as this Court has explained, logic dictates that when a physical health problem requires a woman to undergo a post-viability abortion, she must be permitted to use the least risky procedure, even if it is the "partial birth procedure."

Under Ohio Revised Code § 2919.151(B), when a *physical* health condition so complicates a woman's pregnancy that she must use the "partial birth procedure," she is permitted to do so. As set forth above, the Act provides that "no person shall knowingly perform a partial birth procedure on a pregnant woman *when the procedure is not necessary*, in reasonable medical judgment, to preserve the life or health of the mother...." Ohio Rev.Code § 2919.151(B) (emphasis added). Insofar as § 2919.151(B) *permits* the "partial birth procedure" to be performed post-viability, when that procedure is necessary to preserve a woman's physical health, the Act survives the constitutional analysis set forth above.

As the Court has explained, however, once a physical condition places a woman's health at risk, she *also* must be permitted to undergo the "partial birth

procedure," if it is simply safer than other alternatives. In other words, if a physical condition makes a post-viability abortion necessary (but does not specifically make the "partial birth procedure" necessary), a woman still must be permitted to undergo the banned "partial birth procedure." This is so because "a State may promote but not endanger a woman's health when it regulates the methods of abortion." *Carhart*, 120 S.Ct. at 2609. HB 351 does not contain a provision allowing a woman to undergo the "partial birth procedure," post-viability, when she has a serious physical health problem and the banned procedure, as opposed to an abortion generally, while not absolutely necessary, is the safest method of terminating her pregnancy. Absent such an exception, the Court finds a substantial likelihood that Ohio Rev.Code § 2919.151(B) is unconstitutional.

*Women's Medical Professional Corp.*, 114 F.Supp.2d at 693–95 (footnotes omitted).

In the permanent injunction context, the Plaintiffs do not disagree with the foregoing analysis. For their part, the Defendants fail to address the Court's preliminary injunction finding that HB 351 lacks a necessary provision allowing a woman to undergo the "partial birth procedure," after fetal viability, when she has a serious physical health problem and the banned procedure, while not absolutely necessary, is the safest method of terminating her pregnancy.[30] Rather than addressing this

---

**30.** Presumably, the Defendants believe that no such exception is required, because the "partial birth procedure" is never safer than other alternatives. If the record supported such a conclusion, the Court would agree that nothing in *Carhart* would require the State of Ohio to provide the missing exception. However, as set forth more fully, *supra*, in the Court's analysis of the pre-viability health exception, substantial medical evidence in the

record suggests that the "partial birth procedure" may provide greater safety than other methods of pregnancy termination. As a result, in the post-viability context, HB 351 must include an exception allowing the "partial birth procedure" to be performed when a woman has a serious physical health problem and the banned procedure, while not absolutely necessary, is the safest method of terminating her pregnancy.

crucial point, the Defendants argue only that, in the post-viability context, HB 351 does not need a "mental health" exception. (*See* Doc. # 49 at 33–39). Without respect to the mental health issue, however, the Court finds, for the reasons set forth, *supra*, that, in the post-viability context, the health exception contained in HB 351 is unconstitutional, because it fails to allow a woman to undergo the "partial birth procedure" when she has a serious physical health problem and the banned procedure, while not absolutely necessary, is the safest method of terminating her pregnancy. Absent such an exception, HB 351 fails to satisfy the requirements of *Carhart*.[31] Accordingly, the Court will permanently enjoin the Defendants from enforcing HB 351, insofar as it imposes a ban on the post-viability performance of the "partial birth procedure."

### 4. *Constitutionality of Civil Liability Provision*

■ The Plaintiffs next challenge the constitutionality of the civil liability provision contained in HB 351. That provision permits a woman, upon whom the "partial birth procedure" is performed, to bring a civil action for compensatory and punitive damages against the doctor who performed it. Ohio Rev.Code § 2307.53(B). The same provision permits a civil action to be brought by the father of the aborted fetus, provided that conception did not occur as a result of rape, or by a parent of a woman upon whom the "partial birth procedure" is performed, provided that she is a minor.

In its preliminary injunction ruling, the Court declined to address the constitutionality of HB 351's civil liability provision. In so doing, the Court expressed serious reservations about "its ability to issue an injunction, directed toward the State Defendants, that binds unidentified, and nonparty, private individuals for whom § 2307.53(B) provides a civil cause of action." *Women's Medical Professional Corp.*, 114 F.Supp.2d at 706 n. 55 (citing *Summit Medical Associates, P.C., v. Pryor*, 180 F.3d 1326, 1342 (11th Cir. 1999)). The Court discerned "no purpose in 'enjoining' the Defendants from pursuing a civil action under a statute that does not provide *them* with such a cause of action." *Id.* The Court also noted that enjoining the State Defendants from pursuing a civil action "would not appear to impact those unidentified, private individuals who may possess a civil cause of action, given that they are not parties to this litigation." *Id.* Upon review, the Court remains convinced that it cannot enter a meaningful injunction in this case, regardless of its views on the constitutionality of the civil liability provision of HB 351. Indeed, the Plaintiffs have failed to identify "the wording of the proposed injunction against these [D]efendants that [they] would enter to bar either private plaintiffs from suing under the statute or courts from hearing such suits." *Okpalobi v. Foster*, 244 F.3d 405, 426 n. 34 (5th Cir. 2001) (*en banc*).

Nevertheless, the Plaintiffs urge the Court to review the civil liability provision and to hold that it imposes an undue bur-

---

**31.** In light of this conclusion, the Court need not delve into the disputed issue of whether a partial birth abortion statute must include an exception allowing the banned procedure to be performed to preserve a woman's mental (as opposed to her physical) health. Likewise, the Court need not decide whether a mental health condition might ever make the "partial birth procedure" medically necessary. Given its determination, *supra*, that the health exception contained in HB 351 is unconstitutional, both pre-viability and post-viability, for other reasons, the Court simply has no need to resolve the Plaintiffs' constitutional argument regarding the need for a mental health exception.

den on a woman who seeks a surgical abortion at 18 weeks of gestation and beyond. Despite the Court's finding, *supra,* that HB 351's ban on the "partial birth procedure" is unconstitutional, the Plaintiffs insist that a private lawsuit remains likely under the civil liability provision of the Act.[32] Although the Plaintiffs appear to recognize the impossibility of crafting an injunction against the State Defendants that would shield them (the Plaintiffs) from private civil suits, they stress that their Complaint also seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201. (Doc. # 1 at ¶ 5; Doc. # 51 at 23 n. 10). As a result, they ask the Court to declare that HB 351's third-party civil liability provision is unconstitutional. In support, they reason as follows:

> Under this provision of the Act[,] a physician cannot know before hand who will sue him, be it the woman herself, her husband, fiancé, boyfriend or even casual sex partner. These potential plaintiffs could maintain a suit for unlimited damages, simply because the doctor performed a partial birth procedure, even if the physician believed it was necessary. The plain words of the statute do not foreclose such a possibility. Strict liability abortion lawsuits will become a tool by third party anti-abortion advocates to attack physicians and drain their resources. No physician could continue to provide conscientious medi-

cal care under such harrowing circumstances. Therefore, the third party, civil liability provision must be invalidated as an undue burden under *Casey.*

(Doc. # 51 at 25).

Upon review, the Court declines the Plaintiffs' invitation to opine about the constitutionality of the civil liability provision of HB 351. For essentially the same reasons that the Court cannot issue meaningful injunctive relief, it also cannot issue a declaratory judgment. Regardless of the relief sought (i.e., declaratory or injunctive), the primary obstacle for the Plaintiffs is one of standing under Article III,[33] which requires the existence of a "case or controversy." *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). In order to establish a case or controversy sufficient to give this Court jurisdiction over their challenge to the civil liability portion of HB 351, the Plaintiffs must satisfy three criteria. *First,* they must show that they have suffered, or are about to suffer, an "injury in fact." *Second,* there must be a "causal connection" between the injury and the conduct about which they complain. *Third,* "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation omitted). If the Plaintiffs cannot establish an injury,

---

**32.** It is far from clear that an Ohio physician could face civil liability under HB 351, in light of *Carhart* and the fact that this Court has declared the Act's ban on the "partial birth procedure" to be unconstitutional. *See Hope Clinic v. Ryan,* 249 F.3d 603, 606 (7th Cir.2001). The unconstitutionality of the ban on the "partial birth procedure" likely would be a dispositive defense. In any event, for the reasons set forth, *infra,* the Court concludes that the Plaintiffs lack standing to challenge the civil liability provision of HB 351 in this case, even if their fear of future civil suits is well founded.

**33.** *See Okpalobi v. Foster,* 244 F.3d 405, 431 (5th Cir.2001) (*en banc*) (Higginbotham, J., concurring) ("Lack of standing disposes of this case regardless of the relief sought-injunctive or declaratory."); *Crossen v. Breckenridge,* 446 F.2d 833, 837 (6th Cir.1971) (quoting *Lion Manufacturing Corp. v. Kennedy,* 330 F.2d 833, 838 (D.C.Cir.1964)) (" 'Whether the relief sought is legal or equitable, injunctive or declaratory, it must be within the framework of a true case or controversy capable of meaningful adjudication.' ").

causation and redressability, then they lack standing to seek declaratory relief regarding the constitutionality of Ohio Revised Code § 2307.53(B), the civil liability provision. *See Okpalobi v. Foster,* 244 F.3d 405, 431 (5th Cir.2001) (*en banc*) (Higginbotham, J., concurring) ("[A]lthough the Declaratory Judgment Act 'brings to the present a litigable controversy, which otherwise might only be tried in the future,' it does not jettison traditional standing requirements."); *Johnson v. Turner,* 125 F.3d 324, 336–37 (6th Cir.1997) ("The case-or-controversy requirements of Article III ... are not satisfied merely because a party asks a federal court to declare his legal rights. These requirements have been construed to prohibit such advisory opinions. Indeed, a federal court has no jurisdiction to hear a case that cannot affect the litigants' rights.") (citations omitted).

In the present case, the Plaintiffs have satisfied the first of the foregoing three requirements. Plaintiff Haskell may face the threat of incurring civil liability if § 2307(B) takes effect, given that he performs the "partial birth procedure." [34] As a result, the Plaintiffs suggest that Haskell will be unable to continue performing that procedure unless the Court declares the civil liability provision to be unconstitutional. (Doc. # 51 at 25). The Plaintiffs have not persuaded the Court, however, that a causal connection exists between the threatened injury and any conduct of the *Defendants in this case.* As the Court noted in its preliminary injunction ruling, HB 351 does not provide *these* Defendants with a cause of action for civil liability. *Women's Medical Professional Corp.,* 114 F.Supp.2d at 706 n. 55. Nor would *these* Defendants play any role in a private litigant's pursuit of a civil action under HB

351. In short, the Plaintiffs have not demonstrated that any act of the State Defendants will cause, or even could cause, them to suffer an injury in fact under the civil liability provision. Simply stated, the State Defendants will not inflict the alleged injury. Rather, only unnamed and unidentified private parties who bring private lawsuits have the potential to cause the injury about which the Plaintiffs complain.

In addition, the Plaintiffs have not satisfied the "redressability" requirement of Article III. Even if the Court were to declare Ohio Revised Code § 2307(B) to be unconstitutional, such a ruling would not redress the Plaintiffs' threatened injury. Neither this Court nor the Defendants could prevent non-party private litigants from pursuing a civil action under HB 351, regardless of this Court's ruling. Likewise, neither this Court nor the Defendants could prevent Ohio's courts from hearing those private tort actions, regardless of this Court's view on the constitutionality of the civil liability provision. Given that a declaratory judgment in this case regarding the constitutionality of § 2307(B) would not redress the Plaintiffs' alleged injury in fact, they have not demonstrated a justiciable case or controversy with these Defendants.

The foregoing reasoning is consistent with recent cases from the Fifth and Seventh Circuits. *See Okpalobi v. Foster,* 244 F.3d 405 (5th Cir.2001) (*en banc*); *Hope Clinic v. Ryan,* 249 F.3d 603 (7th Cir. 2001). In *Okpalobi,* abortion providers sued Louisiana's Governor and Attorney General, challenging the constitutionality of a state tort statute that provided abortion patients with a civil cause of action against the doctors who performed their

---

**34.** For purposes of its Article III standing analysis, the Court will assume, arguendo, that Ohio physicians could face civil liability,

despite the fact that HB 351's ban on the "partial birth procedure" has been declared unconstitutional herein.

abortions. As in the present case, the plaintiff abortion providers sought a declaratory judgment that the statute was unconstitutional and injunctive relief preventing its enforcement. Finding the statute to be unconstitutional, the district court entered an order permanently enjoining its implementation, and a panel of the Fifth Circuit upheld the injunction. *See Okpalobi v. Foster*, 190 F.3d 337 (5th Cir.1999). Acting *en banc*, the Fifth Circuit vacated the panel's decision, reheard the case and reversed the judgment of the district court. In so doing, the court reasoned, in relevant part, that the abortion providers lacked standing to seek relief against Louisiana's Governor and Attorney General, because the plaintiffs could not demonstrate a "case or controversy" with those defendants. More specifically, the *en banc* court reasoned that the abortion providers could not satisfy the "causation" or "redressability" requirements, even if the statute at issue did pose the threat of an imminent "injury in fact." In support, the court reasoned, in relevant part, as follows:

> The central weakness of the panel's argument, and the fatal flaw of the dissent's argument that follows this opinion, is that, notwithstanding that the defendants are powerless to enforce Act 825 against the plaintiffs (or to prevent any threatened injury from its enforcement), the plaintiffs yet must show (1) how these impotent defendants play a causal role in the plaintiffs' injury and (2) how these defendants can redress their alleged actual or threatened injury. The panel's reference to the self-enforcing nature of Act 825 is inapposite to the analysis of whether the plaintiffs have any controversy with these defendants. That is to say, the panel confuses the statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the defendants—that is, the Governor and the

Attorney General. This confusion allows the panel to state further: "The Plaintiffs' assertion that they will be forced to discontinue offering legal abortions to patients because of the untenable risks of unlimited civil liability under an unconstitutional Act, sets forth a justiciable case or controversy between the plaintiffs and the Governor and Attorney General of Louisiana." *Id.* Once the coercive impact of the statute (coercive in that it exposes plaintiffs to unlimited tort liability by individual plaintiffs) is understood to be distinct from the coercive power of state officials (for example, if the State could institute criminal or civil proceedings under the Act), the panel's finding of causation here is without a basis. The panel's own citation to *Lujan* recognizes that Article III requires "a causal connection between the *injury and* the *conduct* complained of . . ." 504 U.S. at 560–61, 112 S.Ct. 2130 (emphasis added)—that is, here, a connection between the unwarranted monetary judgment (the injury) and the prosecution of a lawsuit under Act 825 by a private civil litigant (the conduct). The plaintiffs have never suggested that any act of the defendants has caused, will cause, or could possibly cause any injury to them. The requirements of *Lujan* are entirely consistent with the longstanding rule that a plaintiff may not sue a state official who is without any power to enforce the complained-of statute. *See Muskrat v. United States*, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911) (holding that the United States as defendant had no interest adverse to the claimants); *Gritts v. Fisher*, 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912) (finding that the defendant state official was charged with specific duties to enforce the challenged statute and was therefore sufficiently adverse to the

plaintiffs to create an Article III controversy).

The plaintiffs also fail to satisfy the "redressability" requirement of the case or controversy analysis. For all practical purposes, the injunction granted by the district court is utterly meaningless. The governor and attorney general have no power to redress the asserted injuries. In fact, under Act 825, no state official has any duty or ability to do *anything.* The defendants have no authority to prevent a private plaintiff from invoking the statute in a civil suit. Nor do the defendants have any authority under the laws of Louisiana to order what cases the judiciary of Louisiana may hear or not hear. Because these defendants have no powers to redress the injuries alleged, the plaintiffs have no case or controversy with these defendants that will permit them to maintain this action in federal court. *See Muskrat,* 219 U.S. at 346, 31 S.Ct. 250.

In addressing Article III jurisdiction, the dissent focuses on the injury component of the case or controversy requirement, arguing that this component has been "visibly relaxed" in abortion cases. We do not challenge that the plaintiffs are suffering a threatened injury. We only say that the injury alleged by the plaintiffs is not, and cannot possibly be, *caused* by the defendants—that is, these defendants will not file and prosecute a cause of action under Act 825 against these plaintiffs; and that their injury cannot be *redressed* by these defen-

dants—that is, these defendants cannot prevent purely private litigants from filing and prosecuting a cause of action under Act 825 and cannot prevent the courts of Louisiana from processing and hearing these private tort cases. In this way, the dissent makes much the same argument—and thus incorporates the same fatal flaw—as did the panel opinion. It continues to confuse the coercive impact of the statute itself and the ability—or the absence of ability—of the Governor and Attorney General to cause or redress the impact of the statute on the plaintiffs.

*Okpalobi,* 244 F.3d at 426–27 (footnotes omitted).[35]

Similarly, in *Hope Clinic,* the Seventh Circuit reviewed two consolidated appeals involving challenges to the constitutionality of statutes banning partial birth abortions in Illinois and Wisconsin. The plaintiffs in those cases were abortion providers, and the defendants were the Attorneys General of the two states and other public officials. Upon review, the Seventh Circuit found the partial birth abortion bans to be unconstitutional, because they (1) lacked an exception allowing the procedure to preserve the health of the woman and (2) imposed an undue burden on a woman's ability to obtain a dilation and evacuation abortion. *Hope Clinic,* 249 F.3d at 604–05. As in the present case, the Illinois and Wisconsin statutes also contained provisions authorizing private civil suits against doctors who performed partial birth abor-

---

**35.** Seven members of the *en banc* court in *Okpalobi* also concluded that the plaintiffs' challenge to the civil liability statute was barred by the Eleventh Amendment, as it did not fit within the immunity exception recognized in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *See Okpalobi,* 244 F.3d at 410–24; *see also Children's Healthcare is a Legal Duty, Inc. v. Deters,* 92 F.3d 1412, 1415 (6th Cir.1996) (reasoning that *"Young* does not apply when a defendant state official has neither enforced nor threatened to enforce the allegedly unconstitutional state statute"). In light of this Court's conclusion that the Plaintiffs cannot establish a justiciable case or controversy with respect to HB 351's civil liability provision, it need not consider the issue of Eleventh Amendment immunity, which has not been briefed by the Defendants. The Plaintiffs' lack of standing to challenge the civil liability provision, alone, is fatal to their claim.

tions. Applying essentially the same analysis employed herein, the court concluded that the plaintiff abortion providers lacked standing to challenge the civil liability provisions of the two statutes. In relevant part, the Seventh Circuit reasoned:

> [P]laintiffs lack standing to contest the statutes authorizing private rights of action, not only because the defendants cannot cause the plaintiffs injury by enforcing the private-action statutes, but also because any potential dispute plaintiffs may have with future private plaintiffs could not be redressed by an injunction running only against public prosecutors. Both causation and redressability are essential to an Article III controversy. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)....

*Id.* at 605.

Finally, this Court notes that its inability to address the constitutionality of Ohio Revised Code § 2307(B) in this case does not leave the Plaintiffs without any protection. An abortion provider who is sued by a private party under the civil liability provision will be free to challenge the constitutionality of the provision as a defense in such a lawsuit. *See Okpalobi,* 244 F.3d at 429 n. 40. In any event, for the reasons set forth more fully, *supra,* the Court concludes that the Plaintiffs lack standing to challenge the constitutionality of HB 351's civil liability provision in this forum.[36]

## II. *Conclusion*

Based on the reasoning and citation of authority set forth above, the Court rejects the Plaintiffs' arguments (1) that HB 351 is unconstitutionally vague and (2) that it lacks adequate scienter standards. Nevertheless, based on the reasoning and citation of authority set forth above, the Court declares HB 351 to be unconstitutional, insofar as it prohibits the pre-viability performance of the "partial birth procedure." The Court also declares HB 351 to be unconstitutional, insofar as it prohibits the post-viability performance of the "partial birth procedure." The Court reaches the foregoing conclusions because, in both the pre-viability and post-viability context, HB 351 lacks an adequate exception allowing the "partial birth procedure" to be performed when it is necessary to preserve the health of the woman, within the meaning of *Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). In particular, as explained more fully, *supra,* the Act fails to allow a physician to perform the banned procedure in cases where substantial medical evidence shows that it "may bring with it greater safety for some patients[.]" *Id.* at 937, 120 S.Ct. 2597. As a result, the Defendants, their employees, agents and servants are hereby perma-

**36.** The Plaintiffs argue that this Court's refusal to address the constitutionality of the civil liability provision in the present case will needlessly force them to commence a separate action against the Ohio Attorney General in state court, pursuant to Ohio Revised Code § 2721.12(A). (*See* Doc. # 51 at 23 n. 10). It is not immediately apparent to the Court, however, that § 2721.12(A) authorizes the Plaintiffs to bring a state-court declaratory judgment action against the Defendants to challenge the constitutionality of HB 351's civil liability provision. Section 2721.12(A) merely provides that, when a declaratory judgment action implicates the constitutionality of a state statute, the Attorney General must be served with a copy of the complaint and given an opportunity to be heard in defense of the statute. In any event, even if § 2721.12(A) does provide the Plaintiffs with a statutory basis for obtaining a declaratory judgment against the Defendants concerning the constitutionality of the civil liability provision, that fact does nothing to alter this Court's Article III analysis. In other words, the fact that the Plaintiffs might be capable of obtaining a declaratory judgment against the Defendants under Ohio statutory law has no bearing on their Article III standing to obtain such relief in this judicial forum.

nently enjoined from enforcing the provisions of Substitute House Bill 351 which prohibit the pre-viability and post-viability performance of the "partial birth procedure."

In light of the foregoing conclusion, the Court need not address the Plaintiffs' alternative argument that HB 351 imposes an unconstitutional "undue burden" on women who seek to terminate a pregnancy prior to fetal viability.

Finally, insofar as the Plaintiffs challenge the constitutionality of HB 351's civil liability provision, their claim is dismissed for lack of Article III standing, given that the Court finds, based on the reasoning and citation of authority set forth above, that the Plaintiffs have not demonstrated, with regard to this civil liability provision, the existence of a justiciable case or controversy with the Defendants in this litigation.

Judgment will be entered in favor of the Plaintiffs and against the Defendants, permanently enjoining the Defendants, their employees, agents and servants from enforcing any provision of Substitute House Bill 351.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.